821 So.2d 60 (2002)
STATE of Louisiana
v.
John ESTEEN, III.
No. 01-KA-879.
Court of Appeal of Louisiana, Fifth Circuit.
May 15, 2002.
*62 Bertha M. Hillman, Hillman Law Firm, Thibodaux, LA, for Appellant, John Esteen, III.
Paul D. Connick, Jr., District Attorney, Parish of Jefferson, LA, Thomas J. Butler, Terry M. Boudreaux, Appellate Counsel, Kia M. Habisreitinger, John M. Maestri, Assistant District Attorneys, Trial Counsel, Gretna, LA, for Appellee, State of Louisiana.
Panel composed of Judges JAMES L. CANNELLA, THOMAS F. DALEY, and SUSAN M. CHEHARDY.
CANNELLA, Judge.
Defendant, John Esteen, III a/k/a John Audie Esteen, appeals from his sentence and conviction by a jury of two counts of possession of cocaine over 400 grams (Counts 2 and 5), conspiracy to possess cocaine over 400 grams (Count 8), and attempted possession of cocaine over 400 grams (Count 10). We affirm and remand.
The Defendant and 22 others were charged with various racketeering and drug violations in three bills of information. In the bill of information filed February 11, 1999, in addition to Counts 2, 5, 8 and 10, the Defendant was charged in Count 1 with racketeering (La. R.S. 15:1353), which was later dismissed. Count 2 charged the Defendant with possession of cocaine over 400 grams occurring on June 6, 1998. Count 5 charged the Defendant with possession of cocaine over 400 grams occurring on June 27, 1998[1]. Count 10 charged the Defendant with possession of cocaine over 400 grams, occurring on June 27, 1998, in a separate transaction. Count 8 charged the Defendant with conspiracy to possess cocaine over 400 grams, occurring between June 28, 1998 and June 30, 1998. The Defendant pled not guilty to all charges.
Following arraignment, the Defendant and his co-defendants filed motions to suppress the wiretap evidence. The trial judge conducted ten hearings on the several motions.[2] On April 20, 2000, the trial judge, with written reasons, denied all motions to suppress the wiretap evidence.
On October 24, 25, and 27, 2000 the Defendant was tried by jury, separately from his co-defendants. At the end of trial, the Defendant was found guilty of two of the possession charges (Counts 2 and 5) and the conspiracy to possess cocaine charge (Count 8). On Count 10, the jury found the Defendant guilty of the lesser charge of attempted possession of cocaine over 400 grams.[3]
*63 On November 3, 2000, the trial judge sentenced the Defendant to 50 years imprisonment at hard labor on Count 2, 50 years on Count 5, 25 years on Count 8, and 25 years on Count 10. All sentences were to run consecutively, for a total of 150 years of imprisonment at hard labor. The Defendant objected to the excessiveness of the sentence.
On November 9, 2000, the State filed a habitual offender bill of information, alleging that the Defendant had pled guilty on April 15, 1992 to possession of cocaine over 400 grams in violation of La. R.S. 40:979 and 40:967(F) in case number 92-083, Division "K", of the United States District Court for the Eastern District of Louisiana. After the hearing on December 11, 2000, the trial judge found the Defendant to be a habitual offender, vacated the Count 8 sentence of 25 years and sentenced the Defendant to 25 years of imprisonment at hard labor as a habitual offender.
This case arises from an investigation of drug trafficking in Jefferson Parish conducted in early 1998 by the Federal Bureau of Investigations (FBI), the Drug Enforcement Agency (DEA), the Louisiana State Police (LSP), and the Jefferson Parish Sheriff's Office (JPSO). The Defendant is one of many Defendants arrested and convicted as a result of the operation. In conjunction with the investigation, law enforcement agencies obtained pen registers and wiretapping evidence that lead to the arrests of various suspects. Two of those convictions obtained as a result of the wiretaps were affirmed by this Court in State v. Richardson, 00-1551 (La.App. 5th Cir.8/28/01), 795 So.2d 477 and State v. Decay, 01-192 (La.App. 5th Cir.9/13/01), 798 So.2d 1057. (Writs were filed to the Louisiana Supreme Court in both cases.)
Law enforcement officers learned during the investigation that a man named Terry England (England)[4] and others, were trafficking cocaine in and around Jefferson Parish, Louisiana. Through a wiretap on England's telephone, it was learned that Decay was involved with England in the cocaine trafficking in Jefferson Parish. After learning that Decay had three sources for cocaine besides the source that he and England used, the officers decided that Decay was a "viable target" for a wire intercept in an attempt to learn the identities of his three other sources for cocaine.
Based on the information from the investigation, a federal judge authorized the initiation of a pen register, which is a report showing the telephone numbers made from and to Decay's home and cellular telephones. An analysis of the telephone numbers reported by the pen registers disclosed a number of calls to known narcotics distributors. As a result, officers obtained a signed order on May 28, 1998 from Jefferson Parish Judge Clarence McManus authorizing wire intercepts, or wiretaps, to be initiated on Decay's home and cellular telephones and his digital pager. Ultimately, these led to wiretaps on the Defendant's phone and his subsequent arrest for several drug transactions.

FACTS

1) Count 2, possession of cocaine on June 6, 1998
Trooper John Schmidt of the LSP testified at trial that he was assigned to the FBI drug squad task force for New Orleans and that he was the case agent for the wire intercepts of the Defendant's telephone. *64 He stated that a series of phone calls intercepted from the telephone of Decay on June 5 and 6, 1998 disclosed that Decay wanted to purchase two kilos of cocaine from the Defendant for $18,500 each and that a meeting was planned at 1:00 p.m. on June 6, 1998. The men were to meet at the Wal-Mart by the Mc-Donald's restaurant, located near the Huey P. Long Bridge on South Clearview Parkway.[5] As a result of the intercepts, various law enforcement agencies, including the JPSO, DEA, and the FBI, established surveillance at Decay's home and at the meeting place for the drug deal. When Decay left his home, he was followed to the parking lot of the McDonald's. When he arrived, the officers observed the Defendant exit his vehicle and enter Decay's pickup truck. The two drove toward Wal-Mart, made a U-turn and then returned to the Defendant's vehicle in the McDonald's parking lot. When the Defendant got out of Decay's truck, he had a brown shoe box underneath his left arm. As the Defendant got into his car, the Defendant's girlfriend, Sandra Sanchez (Sanchez) who was in his car, got out carrying a large black bag. She then got into Decay's truck. Decay drove along the same path toward Wal-Mart that he had driven with the Defendant in the vehicle. When he returned to the McDonald's parking lot, Sanchez exited Decay's vehicle with a black bag and reentered the Defendant's vehicle. Both vehicles left the parking lot at the same time.
Trooper Schmidt stated that he maintained surveillance on the Defendant's vehicle, while other officers followed Decay. Both vehicles were stopped by law enforcement officers and subsequently searched. Trooper Schmidt testified that a search of Decay's vehicle revealed two kilos of cocaine. A search of the Defendant's vehicle revealed a shoe box containing $33,920 cash.
Trooper Schmidt and Trooper Stephen Orgeron testified that the Defendant's car was stopped for improper display of a license plate. In the car with the Defendant and Sanchez were two Hispanic males, Benjamin Torres (Torres) and Arthuro Castellanos (Castellanos), both of Houston, Texas.[6] The temporary tag for the Defendant's vehicle was found lying on the floor in the back of the vehicle. The officers did not arrest the Defendant at that time because they wanted to gather more information on the Defendant, believing that he was the narcotics supplier.
Sanchez testified at trial that she went to Wal-Mart with the Defendant on June 6, 1998. She stated that Torres and Castellanos, friends of the Defendant, brought the drugs from Houston. Sanchez admitted that the Defendant met with Decay at the McDonald's and came back to their vehicle with a tennis shoe box containing money, and that she got into Decay's vehicle with a black bag and gave him the cocaine. Sanchez stated that Decay placed the cocaine underneath the seat. She identified the black bag containing the cocaine, the shoe box, and the money.
Based on the June 6, 1998, transaction between Decay and the Defendant, Judge McManus signed an order on June 23, 1998, authorizing wire intercepts on the Defendant's and Sanchez's telephone (the Esteen/Sanchez tapes), and on the telephone *65 of Sonya McShane (McShane), also known as Sonya Esteen, the Defendant's sister.

2) Count 10, possession of cocaine on June 27, 1998
On June 27, 1998, officers intercepted several phone calls on McShane's phone that revealed that Decay wanted to purchase two kilos of cocaine from the Defendant. This transaction was set up by McShane to take place at her home that day.[7] Pursuant to these calls, Trooper Schmidt set up surveillance at McShane's residence.
During the surveillance, Decay arrived at McShane's home followed by another vehicle driven by a juvenile, later identified as Ashley Wallace (Wallace). Decay exited his vehicle and met McShane, who was standing on the sidewalk in front of her home. Shortly thereafter, the Defendant arrived and the three went inside. Wallace never left her vehicle. After a short period of time, the Defendant, Decay, and McShane left the house and Decay entered his vehicle. Trooper Schmidt stated that the Decay and Wallace cars drove off at the same time. Both were subsequently stopped by police officers. Two kilos of cocaine were found on the rear passenger side floorboard of the Wallace car by Trooper Tim Bender of the Louisiana State Police.

3) Count 5, possession of cocaine on June 27, 1998
According to three phone calls intercepted from the Defendant's telephone. Another transaction was planned for the evening of June 27, 1998.[8] Through those calls, officers learned that someone named Luke, later identified as Lucas Jefferson, intended to purchase one kilo of cocaine from the Defendant. Sergeant John Ladd and Agent Eric Pearson initiated the surveillance of the Defendant's apartment on that night.
Sergeant Ladd testified that during the surveillance, two individuals drove into the Defendant's apartment complex in a blue Grand Am, exited the car, and entered the Defendant's apartment. Five to ten minutes later, the two men left the Defendant's apartment carrying a brown plastic bag. The bag was placed in the trunk of the Grand Am and they drove away.
According to Sergeant Ladd and Agent Pearson, the vehicle was subsequently stopped and searched. At that time, the driver was identified as Lucas Jefferson and the passenger as Johnny Graham. The search of the car resulted in the discovery of a kilo of cocaine in the brown bag that had been placed in the trunk of the car at the Defendant's apartment complex.
Sanchez, who was in the apartment on June 27, 1998 when Jefferson and Graham arrived, testified that the men arrived with a Dillard's brown plastic bag containing money, that was exchanged for drugs which the Defendant retrieved from Sanchez's closet. After placing the cocaine in the bag, Jefferson and Graham left the apartment.

*66 4) Count 8, conspiracy to possess cocaine on June 29, 30, 1998
Trooper Schmidt testified that several intercepted phone calls disclosed a plan for the Defendant to travel to Houston on June 29, 1998 with his father, John Esteen, Sr. (Esteen, Sr.), Dornechia Smith (Smith), Heather O'Dell (O'Dell), and Robert Moore (Moore) in order to purchase cocaine.[9] Based on these phone calls, the police coordinated efforts with the Houston Police Department, the DEA, an airport interdiction team, and New Orleans officers to set up surveillance.[10]
According to Trooper Schmidt, the Defendant, Smith, and Esteen, Sr. boarded a flight to Houston on June 29, 1998 at 8:15 a.m. Moore and O'Dell boarded a later flight that morning for Houston.
O'Dell, testifying for the State, stated that she and Moore met the Defendant at the Airport Inn in Houston on the afternoon of June 29, 1998, and that the Defendant purchased cocaine from Santiago Gomez and a person named Rubin in the hotel room. Esteen, Sr. and Moore left early the next morning and flew back to New Orleans.
O'Dell testified that she and Smith were the couriers bringing the cocaine to New Orleans for the Defendant, and that she was to be paid $500 for transporting the drugs. O'Dell stated that the Defendant taped packs of cocaine to her legs and to the stomach of Smith. They were delayed returning to New Orleans, because a train they intended to take was five hours late and they could not rent a car because they had no credit card. O'Dell stated that they were subsequently approached by police officers, who searched their luggage, patted them down, found the cocaine and arrested O'Dell and Smith for possession of cocaine.
The Defendant was arrested on August 12, 1998. At that time, he made a statement to Trooper Schmidt in which he admitted that he was a distributor of cocaine and identified his associates. In reference to the June 6, 1998 transaction, the Defendant informed Trooper Schmidt that Decay was a recent cocaine customer, and that Torres and Castellanos were responsible for transporting the narcotics from Houston to New Orleans and for taking the money from New Orleans back to Houston to a person named Lupe Hernandez (Hernandez).[11] Trooper Schmidt stated that Hernandez was later identified as one of the Defendant's several sources of cocaine. In addition, the Defendant also confessed to distributing two kilos of cocaine to Decay on June 27, 1998 at McShane's house. The Defendant told Trooper Schmidt that the cocaine was put into an automobile driven by a female that he did not know.
Following his convictions, the Defendant appealed, asserting first, that the trial judge erred in failing to suppress the evidence *67 obtained from the Decay wiretaps that were improperly admitted into evidence because the State failed to comply with the requirements of La. R.S. 15:1310(F)(1), 15:1310(F)(2) and 15:1310(A)(3). Second, he contends that the trial judge erred in refusing to suppress the evidence obtained from the tapes of the Defendant's telephones because they were not properly sealed in conformity with standard procedure and were not noted in the application to obtain the wiretaps. Third, he contends that the trial judge erred in refusing to reconsider his constitutionally excessive sentence.

1) MOTION TO SUPPRESS THE DECAY TAPES
In his first assignment of error, the Defendant contends that the trial judge erred in excluding the evidence obtained from the Decay wiretaps. He argues that the trial court's denial of his motion to suppress was in error because the wiretaps were not sealed immediately as required by La. R.S. 15:1310(F)(1), because the wiretaps were not sealed in the presence of the judge as required by La. R.S. 15:1310(F)(2), and/or because the State failed to establish that "other investigative measures" were tried and failed before resorting to wiretaps as required by La. R.S. 15:1310(A)(3).
The Defendant's first assignment of error is identical to one of the issues we have already ruled on in State v. Decay, 01-192 (La.App. 5th Cir.9/13/01), 798 So.2d 1057 and State v. Richardson, 00-1551 (La.App. 5th Cir.8/28/01), 795 So.2d 477. As discussed below, we find no reason to deviate from our conclusion in those cases that the trial judge did not err in denying the motion to suppress the evidence obtained as a result of the Decay wiretaps.

A. Timing of the seal of the wiretap evidence under La. R.S. 15:1310(F)(1)
Louisiana's Electronic Surveillance Act, La. R.S. 15:1310, provides the procedure that law enforcement officials must follow for lawful interception of wire or oral communications. Specifically, La. R.S. 15:1310(F)(1) provides that:
The contents of any wire or oral communication intercepted by any means authorized by this Chapter shall be recorded on tape or wire or other comparable device. The recording of the contents of any wire or oral communication under this Subsection shall be done in such way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recording shall be wherever the judge orders. They shall not be destroyed except upon an order of the issuing or denying judge and in any event shall be kept for ten years. Duplicate recordings may be made for use or disclosure pursuant to the provisions of R.S. 15:1309(A) and (B) for investigations. The presence of the seal provided for by this Subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire or oral communication or evidence derived therefrom under R.S. 15:1309(C).
A review of the record indicates that, in the hearings on the motions to suppress, the various defendants argued that the law enforcement officers did not fully comply with the requirement that audio taped evidence must be sealed.[12] However, none of *68 the Defendants argued, during the portion of the suppression hearings devoted to the Decay wiretaps, that the audiotape evidence collected from the wiretap on Decay's home telephone was not timely sealed by the trial judge.[13] Further, in his separate suppression hearings, the Defendant did not raise the issue of the timeliness of the seal on the wiretap evidence. Nor did he challenge the timely sealing of the evidence in his written motion. On the contrary, he argued that the evidence was subject to suppression since it was seized without a valid warrant or a valid exception to the warrant requirement.
Moreover, as stated in the Decay and Richardson cases, at the March 26, 1999 suppression hearing, both Special Agent Wade Barnes and Agent Pearson testified that the wiretap, which was authorized on May 28, 1998, was stopped on June 8, 1998 and the audiotape evidence of the wiretaps was sealed on June 15, 1998. The wiretap order authorized wire interception of telephone calls on the Decay home telephone line until June 28, 1998.
At the initial suppression hearings, the co-defendants did not question the law enforcement officers about the delay between the date on which the wiretap was stopped or the date the tapes were sealed. Furthermore, when the State introduced the sealed box containing the Decay wiretap evidence, none of the co-defendants objected to its introduction. In his separate suppression hearings, the Defendant did not cross-examine Agent Pearson, who was available at that hearing, on the timeliness of the seal on the wiretap evidence. Further, he did not specifically object to the introduction of the wiretap evidence on the grounds that it was not timely sealed.
Because the Defendant failed to raise these issues in the trial court, any question about the timeliness of the seal on the wiretap evidence is not properly before this Court. See: In State v. Smith, 94-120 (La.App. 5th Cir.5/31/94), 638 So.2d 452. However, because we addressed the issue in Decay and Richardson, we will reiterate our analysis of the issue in this case.
Both the Defendant[14] and the State rely on the United State Supreme Court's opinion in United States v. Ojeda Rios, et al., 495 U.S. 257, 110 S.Ct. 1845, 109 L.Ed.2d 224 (1990). However, we concluded in both Richardson and Decay, that those cases are distinguishable. In Richardson we stated:
The Defendant and the State rely on United States v. Ojeda Rios, et al., 495 U.S. 257, 110 S.Ct. 1845, 109 L.Ed.2d 224 (1990). However we find Ojeda Rios distinguishable. (FN10) That case holds that the federal statute which regulates the interception of wire communications requires the seal to be *69 obtained immediately upon expiration of the underlying surveillance order to limit the government's opportunity to alter the recordings. (FN11) 495 U.S. at 263, 110 S.Ct. at 1849. Further, if there is a delay in sealing the recordings, the language of the statute requires that the government explain not only why a delay has occurred, but also why it is excusable. 495 U.S. at 265, 110 S.Ct. at 1850.
In Ojeda Rios, there had been several orders. The trial judge found that (1) there had been at least an 82-day delay in sealing the tapes obtained from the first suspect's old residence under the first order, since the second order was not an extension of the first, and (2) the sealing of the tapes concerning the other two suspects had been delayed 118 days after the February 17, 1985 expiration of the fifth order (regarding the public telephones near their residence), since the sixth order was not an extension of the fifth. The trial judge suppressed the first and fifth tapes on the basis of the delays. The United States Supreme Court did not overrule the finding, but remanded for a determination by the Second Circuit whether the government advanced, in the trial court, a `satisfactory explanation' for the delay in sealing the recordings after the wiretap order had expired. 495 U.S. at 267, 110 S.Ct. at 1851.
Although Ojeda Rios stands as the United States Supreme Court's pronouncement on the issue of what constitutes immediate sealing of recordings after a wiretap order has expired, it does not apply in this case because the audiotape evidence was sealed before the wiretap order had expired.
In La. R.S. 15:1310 F(1) of the Louisiana Electronic Surveillance Act, like the federal wiretap statute, specifies that, "Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." (Emphasis added). In this case, law enforcement officers could have continued to record communications that occurred on the home telephone line (as well as the cellular telephone line and Decay's pager) until June 28, 1998, when the wiretap order expired. Although the wiretap was discontinued on June 8, 1998, the evidence was sealed on June 15, 1998, about two weeks before the wiretap order expired on June 28, 1998. Therefore, we find that the recordings were timely sealed under the specific language of La. R.S. 15:1310 F(1).
Richardson, 795 So.2d at 483, quoted in Decay, 798 So.2d 1057 at 1067.
Based on the foregoing, we find that the tapes used to convict the Defendant were timely sealed under La. R.S. 15:1310 F(1).

B. Sealing in the presence of a judge as required by La. R.S. 15:1310(F)(2)
The Defendant next contends that the tapes were not sealed in the presence of a judge as required by the statute. This issue is also identical to one raised in both Richardson and Decay. In Decay we cited Richardson where we stated:
La. R.S. 15:1310 F(2) provides:
Applications made and orders granted under this Chapter shall be sealed by the judge. Custody of the applications and orders shall be wherever the judge directs. Such applications and orders shall be disclosed only upon a showing of good cause before a judge in whose district the interception of wire or oral communication took place and shall not be destroyed, except on order of the *70 issuing or denying judge, and in any event shall be kept for ten years.
At the suppression hearing on March 26, 1999, Judge Clarence McManus testified as to his general procedure when sealing evidence obtained from wiretaps. He did not testify specifically about Exhibit S 1M, the box at issue in this appeal. He did, however, testify that he did not usually see the tapes or inspect the tapes individually when he signed the sealing order. He indicated that the officer who brings the box to be sealed has generally already sealed the box before presenting the box and sealing order for his signature.
Agent Eric Pearson of the Jefferson Parish Sheriffs Office testified that he gathered the recordings of the wiretap on Decay's home telephone line at the Sheriff's Office and brought the box to Judge McManus' office for sealing. He testified that, usually sheriffs office personnel do not seal the box containing recordings before presenting the box for sealing, but he could not remember whether he had sealed this specific box before presenting it to Judge McManus. He also indicated this case was his first as a case agent.
Trooper John Fitzpatrick of the Louisiana State Police testified that he was present when the box of tapes from the Decay wire intercept was brought to Judge McManus for sealing. He testified that the judge signed the seal on the box as well as the sealing application and order. He was not asked whether the box of tapes was sealed before the judge signed the sealing order.
In her written reasons for denying the suppression motion, the trial judge stated, "At the conclusion of the intercept, the tapes were made available to Judge McManus and sealed pursuant to his directions. Judge McManus executed the sealing order and initialed the seals."
In State v. Cain, 95-0054 (La.App. 4th Cir.2/27/96), 670 So.2d 515, a published writ disposition, (FN14) the Fourth Circuit Court of Appeal noted that "sealing" has not been defined by the Electronic Surveillance Statute, but stated that:
In any event, `sealing' for purposes of the identical federal requirement has been described as the process wherein the government attorney obtains `a sealing order simply by presenting the appropriate papers and tapes to the supervising judge. Other than gathering the tapes, putting them in boxes and taking the tapes to the supervising judge, the record discloses no other necessary steps to sealing ...'
Id. at 523, N. 13.
Here, the officers testified that they presented the tapes to Judge McManus at his office, along with the sealing application and order. They also testified that he signed the application and order, as well as the seal on the box. While it was not clear from the record whether the box was sealed before it was brought to Judge McManus' chambers, we find that the statute does not require the judge ordering the seal to view each tape before the box is sealed, nor does it require that the box be unsealed before presenting to the judge. Id.

Richardson, 795 So.2d at 486, quoted in Decay, 798 So.2d 1057 at 1068-69.
Accordingly, we find that, the trial judge correctly ruled that the tapes were not subject to suppression on the basis that the State failed to comply with the statute's sealing requirements.

C. Other investigative measures required by La. R.S. 15:1310 A(3)
The Defendant contends that the State failed to establish that "other investigative *71 procedures," including undercover agents, confidential informants, or surveillance, had been tried and had failed prior to seeking authority for the wiretap. He also argues that the Decay wiretap was not necessary because the State had sufficient information from his, the John Esteen wiretaps, to infiltrate the Decay operation.
La. R.S. 15:1310 A and A(3) state that:
A. Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge in whose district such interception of wire or oral communication shall take place and shall state the applicant's authority to make such application. Each application shall include the following information:
* * * *
(3) A full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous, or that such circumstances exist that without immediate action a human life may be endangered.
In addition, La. R.S. 15:1310 C and C(4) provides:
C. Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire or oral communications within the territorial jurisdiction of the district in which the judge is sitting, if the judge determines on the basis of the facts submitted by the applicant that:
* * * *
(4) There is reason to believe that investigative procedures have been tried and failed or they reasonably appear to be unlikely to succeed if tried or to be dangerous, or that such circumstances exist that without immediate action a human life may be endangered.
The State introduced a copy of the affidavit in support of the application for the wire intercept authorization. It listed other investigative procedures that were available, but not practical in this case. The affiants included Trooper John Fitzpatrick of the LSP, JPSO Agent Pearson, and DEA Agent Barnes.[15] The information in the affidavit tracks Agent Barnes' testimony at the suppression hearing on March 26, 1999, which is recited in Richardson and Decay, as follows:
Special Agent Barnes testified that pen registers would not have been as effective in this case because the registers only provide the name of the party being called, not the purpose for the call. He also testified that, while physical surveillance is useful, it does not provide details of the conversations or meetings of the target subject, and that Decay was highly suspicious so he employed "counter surveillance" techniques, which made him difficult to follow. Agent Pearson further noted, in his testimony at a later hearing on the Defendants' motion to suppress, that the agents did use physical surveillance in their investigation of the entire drug ring, but it became useful only after they obtained information from the wire intercept on Decay's home telephone line.
Agent Barnes testified that grand jury subpoenas would not have been *72 useful in this investigation either, because the subjects would very likely invoke their Fifth Amendment privilege against self-incrimination, which would stall the investigation. He further explained that although confidential informants can provide very valuable information about the identity of co-conspirators and methods of drug trafficking, most confidential informants are not privy to every aspect of an organization, including where drugs are hidden, how drugs are imported into the area or how the drugs are distributed. Special Agent Barnes stated that search warrants can be very useful, but searching a subject's home will usually not reveal information regarding co-conspirators and other aspects of the investigation.
Special Agent Barnes further testified that undercover agents were not used in this investigation because they are not always able to infiltrate an organization to the extent necessary to understand every aspect of the organization. Although interviews of subjects are useful, they are limited in their scope, since one subject is usually knowledgeable about certain aspects of an organization, but may not have any information on other aspects of the organization.
Richardson, 795 So.2d at 485, cited in Decay, 798 So.2d at 1070.
The Defendant reiterates the arguments he made in the trial court, which were rejected by the trial judge. The decision to deny a motion to suppress is afforded great weight, and it will not be set aside unless the evidence clearly favors suppression. State v. Williams, 98-1006 (La.App. 5th Cir.3/30/99), 735 So.2d 62, 73, writ denied, 99-1077 (La.9/24/99), 747 So.2d 1118. In this case, the trial judge found that the alternative methods were not practical and unlikely to succeed. We agree with that finding and conclude that the trial judge did not err in denying the Defendant's motion to suppress the evidence resulting from the Decay wiretaps.

2) MOTION TO SUPPRESS THE DEFENDANT'S TAPES
In his second assignment of error, the Defendant asserts that the trial judge erred in denying his motion to suppress the tapes of his telephone because they were not properly sealed in conformity with standard procedure and were not authorized by the application for the wiretaps.

A. The sealing of the Defendant's tapes:
The Defendant argues that the tapes from his wiretap were improperly sealed because each individual tape was not sealed in conformity with standard procedure.
Several witnesses for the Lafayette Group, a private company that performed the monitoring services for the wiretaps, testified at the motion to suppress hearing. Lisa Garza testified that she monitored phone calls in this case and that she did not seal any of the audiotapes. She stated, however, that she watched officers seal the tapes with evidence tape. Michelle Romero, testified that she believed the case agent sealed each tape and would sometimes initial the tapes. She also stated that she recalled seeing officers putting the tapes into a brown envelope, seal the envelope and place into a drop box.
Ivonne Patin and James Moody (Moody) testified that the tapes were sealed. Patin testified that she would change a tape, give it to the agent, and then the agent would seal the tape and initial it. She stated that the audiotapes were always sealed. Moody testified that he saw the agent seal the audiotape and wrap red evidence tape *73 around the plastic case. James Lockaby, a retired DEA agent, stated that he saw agents put the individual audiotapes into plastic bag, and that each tape was sealed with an evidence sticker. He also testified that there no red evidence tape was wrapped around the plastic case of each individual tape. William Warner, a retired DEA agent, testified that he did not remember officers putting tape on the plastic tape boxes.
However, Frederick Boyd and Felix Torres (Torres) stated that the audiotapes were sealed with tape and initialed. Torres testified that the audiotapes were initialed on the corner of the tape itself and that the tapes were then placed into a clear plastic envelope along with the pen registers. Torres testified that the plastic envelopes were heat sealed and then put into a locked container. Calvin Lopes (Lopes), 25 year police officer for New Orleans, was unable to remember if the agents sealed any of the tapes in his presence. However, he also stated that he never saw a court order that stated exactly how the items were to be sealed. Lopes testified that two techniques were used to secure the tapes, special tape and sealed evidence bags. Richard Sye stated that each agency had its own procedure for securing the tapes. He testified that he witnessed agents putting the tapes into the plastic containers and placing red tape around the case. Lisa Fleming (Fleming), a narcotic's agent with the JPSO, testified that she was responsible for sealing all the evidence tapes on her night shift. She testified that she did not seal any of the audiotapes individually, but that the tapes were placed into specialized envelopes along with the counter numbers. The envelopes were sealed and placed into a secured box. Fleming also testified that she was never given any instructions to seal the individual tapes. She also stated that she did not seal any tapes in plastic envelopes.
La. R.S. 15:1310(F)(1) states in part:
F. (1) The contents of any wire or oral communication intercepted by any means authorized by this Chapter shall be recorded on tape or wire or other comparable device. The recording of the contents of any wire or oral communication under this Subsection shall be done in such way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recording shall be wherever the judge orders. They shall not be destroyed except upon an order of the issuing or denying judge and in any event shall be kept for ten years. Duplicate recordings may be made for use or disclosure pursuant to the provisions of R.S. 15:1309(A) and (B) for investigations. The presence of the seal provided for by this Subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire or oral communication or evidence derived therefrom under R.S. 15:1309(C).
La. R.S. 15:1310 does not require that each audiotape be individually sealed. The statute provides that the recordings be sealed under the judge's directions. In this case, the order issued by Judge McManus authorizing the wiretap of the Defendant's and Sanchez's telephone does not state that the individual recordings must be sealed. The order only states that the recordings must be sealed before the judge, and that custody of the tapes are to *74 remain with the LSP and JPSO.[16] According to Trooper Schmidt, on July 13, 1998, the wire communication recordings pertaining to the Defendant were placed in a box and presented to Judge McManus to be sealed as directed in the order.
The Defendant does not cite any authority to support his position that the individual recordings of the Defendant and Sanchez must be sealed. Thus, since La. R.S. 15:1310 and the order issued by Judge McManus do not require each tape to be individually sealed, we find that the trial judge did not err in refusing to suppress the evidence based on the Defendant's tapes on the basis that they were not individually sealed.

B. The Defendant and Sanchez wiretap was not authorized because the phone number changed.
The Defendant further argues that when he changed his telephone number, the police began intercepting unauthorized communications from a number not specified in the order.
Trooper Schmidt testified at the suppression hearing on March 26, 1999 that the June 23, 1998 wiretap order signed by Judge McManus listed the Defendant's phone number in use at that time. Trooper Schmidt also testified that the Defendant changed his phone number on July 8, 1998. He stated that when the number was changed, he contacted the Attorney General's office with this information. Following that conversation, he decided to stop the wiretap on the telephone at the Defendant's house. The wire communications that had already been recorded were put into a box and presented to Judge McManus to be sealed according to the order. The box was sealed on July 13, 1998. This is supported by the record that shows that the intercepted calls from the Defendant's residence that were admitted into evidence in this case were recordings from the number listed in the order and were made before the phone number was changed on July 8, 1998. Furthermore, the July 13, 1998 sealing order signed by Judge McManus indicates that he sealed 25 audiotape recordings of wire communications that were intercepted between June 23, 1998 and July 8, 1998, the date of the phone number change. Thus, whether or nor the statute requires the specific phone number to be included in the order, the phone that was tapped in this case was on the order, and the taps were made before the Defendant changed his phone number.[17] Thus, we find no merit to this issue.

*75 3) EXCESSIVE SENTENCE

A) Original sentences
The Defendant contends that he received the maximum sentence and that there were no sufficient aggravating circumstances to warrant imposition of life imprisonment under La.C.Cr.P. art. 894.1. He argues that the sentence was excessive because he is not the worst type of offender and that the imposition of the sentence was grossly out of proportion to the severity of the crime.
Under La.C.Cr.P. art. 881.1, a defendant must either move for reconsideration of his sentence at the time of sentencing orally, or file a written motion to reconsider his sentence setting forth the specific grounds on which the motion is based. Where a defendant merely objects to the excessiveness of the sentence without stating the specific grounds for his objection, he is limited to a bare review of the sentence for constitutional excessiveness. State v. Hester, 99-426 (La.App. 5th Cir.9/28/99), 746 So.2d 95, 103, writ denied in State v. Patterson, 99-3217 (La.4/20/00), 760 So.2d 342. In the present case, the Defendant merely objected to the excessiveness of the sentence. Thus, he is limited to a bare review of his sentence for constitutional excessiveness.
Both the United States and Louisiana constitutions prohibit the imposition of excessive or cruel punishment. U.S. Const. Amend. 8; La. Const. of 1974, Art. *76 I, Sect. 20; State v. Richmond, 98-1015 (La.App. 5th Cir.3/10/99), 734 So.2d 33, 38. A sentence is generally considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. Id.; State v. Lobato, 603 So.2d 739, 751 (La.1992). A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. However, the sentence will not be set aside absent a showing of manifest abuse of the trial court's wide discretion to sentence within statutory limits. Richmond, 734 So.2d at 38. The trial judge is afforded wide discretion in determining a sentence and, if the record supports the sentence imposed, the court of appeal will not set aside a sentence for excessiveness. La. C.Cr.P. art. 881.4(D); Richmond, 734 So.2d at 38. Nonetheless, a sentence may be reviewed for excessiveness even though it is within statutory range. Id.
At the time of the Defendant's convictions, the sentencing range for possession of cocaine over 400 grams was for "a term of imprisonment at hard labor of not less than thirty years, nor more than sixty years and to pay a fine of not less than two hundred fifty thousand dollars, nor more than six hundred thousand dollars." La. R.S. 40:967 F(1)(c). See: R.S. 40:964, Schedule II, (A)(4).[18]
In this case, the Defendant was sentenced to 50 years imprisonment at hard labor on each count and the trial judge did not impose the fine. These sentences are not the maximum, as argued by the Defendant.
The Defendant was also convicted of attempted possession of cocaine over 400 grams in violation of La. R.S. 40:967(F) and La. R.S. 14:27, the attempt statute.[19] For an attempted possession of cocaine over 400 grams, the sentencing range is imprisonment "in the same manner as the offense attempted and such fine or imprisonment shall not exceed one-half of the largest fine or one-half of the longest term of imprisonment prescribed for the offense attempted, or both."
In this case, the maximum sentence for attempted possession of cocaine over 400 grams was 30 years and a fine of not more than $300,000. The Defendant was sentenced to 25 years imprisonment at hard labor and was not fined. This sentence is also not the maximum.
*77 Finally, the Defendant was convicted of conspiracy to commit possession of cocaine over 400 grams, in violation of La. R.S. 40:967(F) and La. R.S. 14:26. A conviction of conspiracy to commit possession of cocaine over 400 grams requires that the sentence not exceed one-half of the largest fine or one-half the longest term of imprisonment prescribed for the crime of possession of cocaine over 400 gram, or both.[20]
Again, the Defendant was sentenced within the statutory limits. The trial judge sentenced him to 25 years imprisonment at hard labor, which is less than one-half of the prescribed term of imprisonment (60 years), and the trial court did not impose the required fine.
The trial judge stated the following reasons for sentencing the Defendant:
Stand up, Mr. Esteen. Mr. Esteen, I remember this trial vividly because it was so short a time ago.
You destroyed your own life and you destroyed many other individuals' lives in the course of what came out in this trial. God knows how many more lives you would have destroyed if you were on the street yet.
I don't see any redeeming factors concerning your involvement in [the] sale of the quantity of drugs I've seen. I've seen four kilos of hard cocaine in this court which is a quantity you don't see very often. I can't have any sympathy for the sentence I am going to impose on you or plight.
(R., p.2068).
A reviewing court will not set aside a sentence as excessive if the record supports the sentence imposed. La.C.Cr.P. art. 881.4(D); State v. McCorkle, 97-966, p. 14 (La.App. 5th Cir.2/25/98), 708 So.2d 1212, 1219.
In this case, the Defendant's sentences are within the statutory limits. Furthermore, the trial judge noted that the Defendant is a serious drug dealer and failed to present any mitigating circumstances to warrant lesser sentences. Accordingly, we find that the imposed sentences are constitutional.

B. Habitual offender sentence
For the same reasons, we find that the enhanced habitual offender sentence is not constitutionally excessive. After the trial judge found the Defendant to be a habitual offender, he vacated the sentence as to Count 8 and re-sentenced the Defendant to 25 years imprisonment at hard labor. See: La. R.S. 15:529.1. Under the habitual offender statute, the Defendant could have received a sentence of 60 years as a second offender.[21] Thus, the trial judge was within the statutory guidelines in sentencing the Defendant as a second felony offender to 25 years imprisonment at hard labor on Count 8. Furthermore, the Defendant did not present *78 any evidence at the habitual offender hearing that would justify a lesser sentence.

ERROR PATENT
We have reviewed the record for patent errors, according to La. C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975), and State v. Perrilloux, 99-1314 (La.App. 5th Cir.5/17/00), 762 So.2d 198, 206. We find the following errors.
At the time of the original sentencing and the sentencing at the habitual offender proceeding, the trial judge failed to inform the Defendant of the two year prescriptive period for the filing of post-conviction relief as provided by La.C.Cr.P. art. 930.8. Subpart C of that article requires the trial court to inform the Defendant at the time of sentencing. Therefore, we will remand the case to the trial court with orders to send written notice of the prescriptive period to the Defendant within ten days of the rendering of this opinion and to file written proof in the record that the Defendant received such notice. State v. George, 99-887 (La.App. 5th Cir.1/4/00), 751 So.2d 973.[22]
We also note that the sentences are illegally lenient in several respects. At the sentencing, the trial judge failed to state whether the sentences imposed were to be served with or without benefit of parole, probation or suspension of sentence, as required by La. R.S. 40:967(G); and further failed to impose mandatory fines. However, we need not remand for correction as to the former because under State v. Williams, 00-1725 (La.11/29/01), 800 So.2d 790,799, and La. R.S. 15:301.1(A),[23] the "without benefits" provision is self-activating. Therefore, under La. R.S. 40:967(G) and the self-activating language of La. R.S. 15:301(A), the first 30 years (minimum sentence described in paragraph G of La. R.S. 40:967) of the sentences imposed for Counts 2 and 5 shall be *79 served without benefit of parole, probation or suspension of sentence, the first 15 years (minimum sentence) imposed for Count 10 shall be served without benefit of parole, probation or suspension of sentence, and the first 15 years (minimum sentence) of the sentence imposed Count 8 for the Defendant as a habitual offender shall be served without benefit of parole, probation or suspension of sentence.[24]
In regard to the failure of the trial judge to impose the mandatory fines, La. R.S. 15:301.1(B) and (D) provide that an amendment of a sentence to conform with an applicable statutory provision may be made on the trial courts' own motion or if the district attorney seeks the amendment, but only if the action is taken within 180 days of the initial sentence. The State did not object to this illegality and the 180 day delay has expired. Therefore, this illegally lenient sentence cannot be acted upon. See: Williams, 800 So.2d at 799.
Finally, the minute entry for December 11, 2000 when the Defendant was sentenced as a habitual offender, states that Count 10 was vacated and that the Defendant was then sentenced to 25 years as a habitual offender based on Count 8. However, the transcript of the sentencing states that Count 8 was vacated by the trial court. Although the transcript prevails over the minute entry, the minute entry should be corrected.
Accordingly, the Defendant's convictions and sentences are hereby affirmed. The case is remanded to the trial court with our order for the trial judge to send written notice of the prescriptive period for filing an application for post-conviction relief pursuant to La.C.Cr.P. art. 930.8. to the Defendant within ten days of the rendering of this opinion, and to file written proof in the record that the Defendant received such notice. Also the trial court is ordered to correct the minute entry to read that the sentence in Count 8 was vacated before it was enhanced.
CONVICTIONS AND SENTENCES AFFIRMED; CASE REMANDED WITH INSTRUCTIONS.
NOTES
[1] Count 5 alleges that Rene Decay, Lucas Jefferson, and Johnny Graham possessed cocaine over 400 grams in violation of La. R.S. 40:967(F). The bill of information was amended as to count 5 on September 10, 1999 to delete the name of Rene Decay and add John Esteen.
[2] The hearings were held on March 26, 1999, April 21, 1999, May 14, 1999, May 28, 1999, July 16, 1999, July 30, 1999, September 10, 1999, October 21, 1999, January 28, 2000, and February 18, 2000.
[3] We note that the minute entry for October 24, 2000, the first day of trial, incorrectly indicates that the charges against the Defendant were for possession and conspiracy to possess "over 28 grams" and not "over 400 grams." This mistake is also indicated in the minute entry for November 3, 2000, the date of sentencing. The bill of information, the reading of the charges to the jury, the transcript for the sentencing and the verdict sheet all indicate the correct amount of "over 400 grams."
[4] England was not charged in the bill of information in this case.
[5] The intercepted phone calls were call # 569 on June 5, 1998 at 9:02 p.m., call # 602 on June 6, 1998 at 9:42 a.m., and call # 634/635 on June 6, 1998 at 12:24 p.m. These calls were introduced into evidence and played for the jury.
[6] Both Torres and Castellanos were also named as co-defendants in the original bill of information.
[7] The intercepted phone calls include calls # 1020, # 1022, # 1028, # 1040, # 1052 and # 1054 on June 27, 1998. Call # 1054 consisted of a digital page. All the phone calls, with the exception of the digital page, were played for the jury and admitted into evidence.
[8] The intercepted phone calls were from the Defendant and Sanchez's telephone. The calls included call # 72 on June 27, 1998 at 10:06 a.m., call # 103 on June 27, 1998 at 10:23 p.m., and call # 104 on June 27, 1998 at 10:23 p.m. All three phone calls were played for the jury.
[9] Dornechia Smith, Heather O'Dell and Robert Moore were among the 22 named defendants in the original bill of information.
[10] The intercepted phone calls were from the telephone of McShane and the Defendant. The calls included call # 1134 on June 28, 1998 at 10:32 a.m., call # 1298 on June 28, 1998 at 3:38 p.m., call # 166 on June 29, 1998 at 5:31 a.m., call # 1388 on June 29, 1998 at 5:35 a.m., call # 171 on June 29, 1998 at 5:41 a.m., call # 172 on June 29, 1998 at 5:44 a.m., call # 173 on June 29, 1998 at 5:50 a.m., call # 175 on June 29, 1998 at 5:52 a.m., call # 176 on June 29, 1998 at 5:52 a.m., call # 177 on June 29, 1998 at 6:06 a.m., call # 200 on June 29, 1998 at 8:57 p.m., call # 222 on June 29, 1998 at 11:20 p.m. These calls were played to the jury.
[11] Hernandez was also one of the 22 co-defendants named in the original bill of information.
[12] With respect to the Decay wiretap evidence, the several defendants argued, among other things, that each individual audiotape was not enclosed in either a plastic holder or envelope, that the proper law enforcement agent did not properly seal each tape, and that each tape should be sealed with red evidence tape.
[13] In arguing his motion to suppress, the Defendant stated, "I am adopting the various questions that were put forth at all the previous motion hearings, Judge, and would like the Court to incorporate all of the previous motion hearings in support of my Motions to Suppress in this case." (R., p. 773).
[14] The Defendant quotes extensively from State v. Cain, 95-0054 (La.App. 4th Cir.2/27/96), 670 So.2d 515, 521-522. Cain is factually similar to Ojeda Rios. In Cain, the order expired and there was a delay of between 109 and 136 days in having the tapes judicially sealed. Id. at 522. Because the delay occurred after the wiretap authorization had expired, Cain, like Ojeda Rios, is distinguishable from this case.
[15] Other affiants were Jefferson Parish District Attorney Paul Connick, Colonel W.R. Whittington of the LSP, and Assistant State Attorney General Timothy Screen.
[16] The order states in part:

IT IS FURTHER ORDERED, that the recordings made of these interceptions shall be sealed before me and thereby protected from editing or altercation. Custody of the original tapes made in connection with this authorized interception of wire communications, upon sealing, shall remain with the Louisiana State Police and the Jefferson Parish Sheriff's Office, until further orders of his court ...
[17] La.R.S. 15:1310(A) and (D) set forth the requirements of an order authorizing the interception of wire or oral communications. Nowhere in the statute does it state a requirement that specific phone numbers must be stated in the application or in the order. It states:

A. Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge in whose district such interception of wire or oral communication shall take place and shall state the applicant's authority to make such application. Each application shall include the following information:
(1) The identity of the investigative or law enforcement officer making the application and the person authorizing the application.
(2) A full and complete statement of the facts and circumstances relied upon by the applicant to justify his belief that an order should be issued, including:
(a) Details as to the particular offense that has been, is being, or is about to be committed,
(b) A particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted,
(c) A particular description of the type of communications sought to be intercepted, and
(d) The identity of the person, if known, committing the offense and whose communications are to be intercepted.
(3) A full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous, or that such circumstances exist that without immediate action a human life may be endangered.
(4) A statement of the period of time for which the interception is required to be maintained, which shall not exceed thirty days.
(5) When the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results.
(6) A full and complete statement of the facts concerning previous applications for the past five years, known to the individuals authorizing and making the application, made to any judge for authorization to intercept, or for approval of interception of, wire or oral communications involving any of the same persons, facilities, or places specified in the application, and the action taken by the judge on each such application.
The specifics of the order are set out in La.R.S. 15:1310(D), as follows:
D. Each order authorizing or approving the interception of any wire or oral communication shall specify:
(1) The identity of the person, if known, whose communications are to be intercepted.
(2) The nature and location of the communications facilities as to which, or the place where, authority to intercept is granted.
(3) A particular description of the type of communication sought to be intercepted and a statement of the particular offense to which it relates.
(4) The identity of the agency authorized to intercept the communications, the person applying for the application, and the person authorizing the application.
(5) The period of time during which such interception is authorized.
[18] The statute has since been amended, effective July of 2001. However, since both the crime and the sentence occurred prior to the enactment of the amended statute, it is not applicable here.
[19] La.R.S. 14:27 states in pertinent part:

D. Whoever attempts to commit any crime shall be punished as follows:
(1) If the offense so attempted is punishable by death or life imprisonment, he shall be imprisoned at hard labor for not less than ten nor more than fifty years without benefit of parole, probation, or suspension of sentence;
(2) If the offense so attempted is theft or receiving stolen things, and is not punishable as a felony, he shall be fined not more than two hundred dollars, or imprisoned for not more than six months, or both. If the offense so attempted is receiving stolen things, and is punishable as a felony, he shall be fined not more than two hundred dollars, or imprisoned not more than one year, or both. If the offense so attempted is theft, and is punishable as a felony, he shall be fined not more than five hundred dollars, or imprisoned not more than one year, or both;
(3) In all other cases he shall be fined or imprisoned or both, in the same manner as for the offense attempted; such fine or imprisonment shall not exceed one-half of the largest fine, or one-half of the longest term of imprisonment prescribed for the offense so attempted, or both.
[20] LSA R.S. 14:26 states in pertinent part:

C. Whoever is a party to a criminal conspiracy to commit any other crime shall be fined or imprisoned, or both, in the same manner as for the offense contemplated by the conspirators; but such fine or imprisonment shall not exceed one-half of the largest fine, or one-half the longest term of imprisonment prescribed for such offense, or both.
[21] La.R.S. 15:529.1 states:

(a) If the second felony is such that upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life, then the sentence to imprisonment shall be for a determinate term not less than one-half the longest term and not more than twice the longest term prescribed for a first conviction....
[22] We also note that the trial judge did not specifically rule whether the Defendant was a second felony offender when he declared the Defendant to be a "multiple" offender. However, when the evidence presented by the State is restricted to one prior felony, the trial judge's finding that the Defendant is a habitual offender can only relate to a second offense. See: State v. Henderson, 94-286 (La. App. 5th Cir.12/14/94), 648 So.2d 974, 979. Therefore, we need not remand the case for a rehearing on the habitual offender bill.
[23] La.R.S. 15:301.1 states:

A. When a criminal statute requires that all or a portion of a sentence imposed for a violation of that statute be served without benefit of probation, parole, or suspension of sentence, each sentence which is imposed under the provisions of that statute shall be deemed to contain the provisions relating to the service of that sentence without benefit of probation, parole, or suspension of sentence. The failure of a sentencing court to specifically state that all or a portion of the sentence is to be served without benefit of probation, parole, or suspension of sentence shall not in any way affect the statutory requirement that all or a portion of the sentence be served without benefit of probation, parole, or suspension of sentence.
B. If a sentence is inconsistent with statutory provisions, upon the court's own motion or motion of the district attorney, the sentencing court shall amend the sentence to conform to the applicable statutory provisions. The district attorney shall have standing to seek appellate or supervisory relief for the purpose of amending the sentence as provided in this Section.
C. The provisions of this Section shall apply to each provision of law which requires all or a portion of a criminal sentence to be served without benefit of probation, parole, or suspension of sentence, or of any one of them, any combination thereof, or any substantially similar provision or combination of substantially similar provisions.
D. Any amendment to any criminal sentence as authorized by the provisions of this Section shall be completed within one hundred eighty days of the initial sentencing.
[24] The restrictions on parole eligibility imposed on habitual offender sentences under La.R.S. 15:529.1 "are those called for in the reference statute." State v. Bruins, 407 So.2d at 685, 687 (La.1981).