871 So.2d 599 (2004)
STATE of Louisiana
v.
Larry HARRIS and Leon Williams, Jr.
No. 03-KA-1297.
Court of Appeal of Louisiana, Fifth Circuit.
March 30, 2004.
*602 Paul D. Connick, Jr., District Attorney, Terry M. Boudreax, Andrea F. Long, Cameron M. Mary, Donald A. Rowan, Jr., Assistant District Attorneys, Gretna, LA, for The State of Louisiana, Plaintiff/Appellee.
Holli Herrle-Castillo, Louisiana Appellate Project, Marrero, LA, for Leon Williams, Jr., Defendant/Appellant.
Jane L. Beebe, Louisiana Appellate Project, Gretna, LA, for Larry Harris, Defendant/Appellant.
Panel composed of Judges SOL GOTHARD, JAMES L. CANNELLA and WALTER J. ROTHSCHILD.
WALTER J. ROTHSCHILD, Judge.
On April 27, 2000, a Jefferson Parish Grand Jury indicted defendants, Larry Harris and Leon Williams, Jr., for first degree murder in violation of LSA-R.S. 14:30. On May 1, 2000, both defendants pled not guilty to the charge.[1] Thereafter, the defendants filed various pretrial motions including a Motion to Suppress Evidence and Identification. On September 22, 2000, the trial court heard and denied defendants' motions to suppress.
On March 31, 2001, defendants proceeded to trial and were subsequently found guilty as charged. On April 27, 2001, defendants were sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On appeal, this Court reversed the convictions and sentences of Harris and Williams due to an error in jury selection and remanded *603 the case for a new trial. See, State v. Harris, 01-1299 (La.App. 5 Cir. 10/29/02), 829 So.2d 675 (decision without published opinion) and State v. Williams, 01-1298 (La.App. 5 Cir. 10/29/02), 829 So.2d 675 (decision without published opinion).
On remand, defendants filed various pretrial motions including Motions to Suppress Confession, Identification, and Physical Evidence. On February 28, 2003, defendants' motions to suppress were denied based upon the previous ruling of the trial court and the lack of any new evidence. On April 21, 2003, the State amended the charge to second degree murder in violation of LSA-R.S. 14:30.1. That same day, defendants proceeded to a trial by jury.
On April 25, 2003, the jury returned a verdict finding Harris and Williams guilty as charged. On May 19, 2003, the trial court denied Harris and Williams's previously filed motions for new trial. After waiving all delays, Harris and Williams were each sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Both defendants filed timely motions for appeal.

FACTS
At trial, testimony was heard from the following: Vanessa Mack, Lieutenant Don English, Deputy Matthew Schoder, Louise Walzer, Dr. Susan Garcia, Deputy Michael Tucker, Sergeant Angelo Smith, Charles Robinson, Larry Harris, Wardell Williams, and Patrice Harris. Due to the unavailability of certain witnesses, the remainder of the trial testimony was introduced by way of exhibits consisting of transcripts from the previous trial and the September 22, 2000 hearing on the motion to suppress.
At approximately 9:00 p.m. on February 21, 2000, Vanessa Mack and her cousin, Malinda James, arrived at the Sports Palace located on Jefferson Highway to shoot pool. After getting off of work at 9:30 p.m., Ronald Lewis, Mack's long-time neighbor, arrived at the Sports Palace at around 10:00 p.m. Mack, upon noticing Lewis, invited him to join her and her cousin in a game of pool, and Lewis accepted the invitation. At approximately midnight, Mack and James decided to leave and asked Lewis if he would walk them to their car. The group exited the bar and, as they neared Mack's car, Mack observed two men running from behind a dumpster located next to the Sports Palace. As the men neared, Mack was able to recognize them as being the defendants, Larry Harris and Leon Williams. Harris approached and asked Mack, "What's happening?" and then pulled a gun out of his pocket and proceeded to shoot Lewis who fell to the ground. Mack then observed Williams shoot James who also fell to the ground. Shortly thereafter, Harris shot Mack in the arm. After being shot, Mack walked toward her car and, while attempting to get inside, was shot in the back around her shoulder blade. Mack managed to get inside of her car but suffered additional gun shot wounds while seated inside of the vehicle. Mack ultimately sustained five gun shot wounds including wounds to her arm, back, and both breasts. However, Mack was unsure of who fired the additional shots after she was first struck in the arm.
Donald Davidson, who was at Pickle's Sports Bar located near the Sports Palace, heard the shooting and called 911. The 911 call was received by the Jefferson Parish Sheriff's Office and officers were dispatched to the scene at 12:36 a.m. Deputy Matthew Schoder responded to the radio dispatch call directing him to the corner of Harding and Jefferson Highway. At approximately, 12:38 a.m., Deputy Schoder, as well as his sergeant, Brady *604 Buckley, arrived at the scene and immediately observed a tan car with a body lying beneath the car door. Deputy Schoder determined that James, the woman lying on the ground, was dead. He then observed Mack, who appeared to have been shot, sitting in the driver's seat of the vehicle. Sergeant Buckley asked Mack who had done this to her to which she responded, Larry Harris. Mack then informed them that Harris lived on Clara street "in the city." After going in and out of consciousness, she later identified the other individual in the assault as "Leon."
Deputy Schoder subsequently observed a third person approximately forty feet away lying face down across Harding Street. The individual, who Deputy Schoder later learned was Ronald Lewis, appeared to have a bullet wound to the back of his head. Lewis was awake but was unable to speak. After assisting the EMTs with securing the two wounded victims, Deputy Schoder and Sergeant Buckley secured the scene and waited for the arrival of the detectives.
Lieutenant Don English, homicide detective with the Jefferson Parish Sheriff's Office, arrived at the scene between 1:00 a.m. and 1:30 a.m. Lieutenant English met with Deputy Schoder and was advised that Mack had identified one of the shooters as Larry Harris and the other shooter by the name "Leon.". Lieutenant English instructed Deputy Michael Tucker of the Jefferson Parish Homicide Division to proceed to the hospital in order to gain any information from the victims.
Upon arriving at the hospital, Deputy Tucker was advised that Lewis was in surgery and that Mack was being stabilized. Deputy Tucker was given a few minutes to interview Mack, and Mack informed him that one of the shooters was her ex-boyfriend, Larry Harris, and the other individual was Harris's friend, Leon. She also informed Deputy Tucker of Harris's address as well as a date of birth and a physical description. After obtaining the information, Deputy Tucker prepared a warrant for Harris's arrest. Deputy Tucker also participated in the execution of a search warrant of Harris's home where no incriminating evidence was recovered.
In conjunction with the investigation, Dr. Susan Garcia of the Jefferson Parish Coroner's Office performed an autopsy on the body of James, which revealed that she had sustained eight separate identifiable entrance wounds and five identifiable exit wounds. The cause of death was listed as multiple gunshot wounds to the head, chest and arms, with potentially lethal wounds to the head, right lower back and mid-back areas. Additionally, during the autopsy, Dr. Garcia recovered three projectiles from James' body.
The projectiles, as well as six spent casings recovered from the scene, were analyzed by Louise Walzer, firearms expert with the Jefferson Parish Sheriff's Office. Walzer, after examining the spent casings and projectiles, determined that two weapons, a 9 mm semi-automatic and a revolver consistent with a .38 or .357 caliber, were used in the shooting. However, Walzer could not determine if there was more than one shooter.
On February 22, 2000, after being informed by his daughter that he was a suspect in the shootings, Harris purchased a Greyhound Bus ticket to Houma. After arriving in Houma, Harris contacted his cousin, Charles Robinson, and, with the assistance of Robinson's attorney, turned himself into the Terrebonne Parish authorities on February 23, 2000. The Jefferson Parish Sheriff's Office was contacted and Sergeant Dennis Lacompte, assistant shift commander at the Terrebonne Parish Consolidated jail, released Harris into the custody of Lieutenant English.
*605 On February 28, 2000, after having been released from the hospital, Mack was riding around New Orleans with her sister when she observed Williams sitting inside of a truck, which was parked at an Auto Zone. Mack and her sister followed the truck and wrote down the license plate number and the type of clothing Williams was wearing. Eventually, Mack and her sister were able to come into contact with Sergeant Angelo Smith of the New Orleans Police Department and advised him that she had seen the person who had tried to murder her. Sergeant Smith eventually observed a yellow truck with Mississippi plates that matched the description given to him by Mack and also observed a gentleman in the back of the truck meeting Williams's description.
After being taken to the location where Williams had been observed, Mack positively identified Williams. Williams was then taken to the Sixth District Police Station and Deputy Tucker was contacted by Lieutenant Steve Buras of the New Orleans Police Department and informed that Williams was being detained. Deputy Tucker reported to the Sixth District and, after reading Williams his rights, received a statement from Williams that he was friends with Harris and he had heard about the shooting and that police were looking for Harris. However, Williams denied any involvement stating that he was with a girlfriend at another address. Additionally, while at the Sixth District, Deputy Tucker was able to interview Mack and was informed that two weapons were used in the shooting, a revolver and a semi-automatic handgun. Mack informed Deputy Tucker that Harris was the individual wielding the revolver.
On July 31, 2000, Lieutenant English met with Ronald Lewis at his home and showed him two photographic lineups. One lineup contained a photograph of Harris and the other contained a photograph of Williams. When shown the first lineup containing Harris's photograph, Lewis became very excited and pointed to Harris's picture. Lewis was then shown the second lineup containing a photograph of Williams but he was unable to make an identification.

ASSIGNMENT OF ERROR NUMBER ONE (LARRY HARRIS)
The trial court erred in admitting the unreliable identification testimony of Ronald Lewis, when there was uncontroverted medical documentation that Mr. Lewis could not recall the shooting.

ASSIGNMENT OF ERROR NUMBER ONE (LEON WILLIAMS, JR.)
The identification testimony of Ronald Lewis should have been suppressed.

DISCUSSION
When issues are raised on appeal as to one or more trial errors, the reviewing court should first determine sufficiency of the evidence. When the entirety of the evidence, including evidence that was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any issues regarding trial errors become moot. State v. George, 95-110 (La.10.16/95), 661 So.2d 975, 978; State v. Bolden, 03-0266 (La. App. 5 Cir. 7/29/03), 852 So.2d 1050, 1055-1056. For the sake of clarity and cohesion, we will first address defendants' assignments of error challenging the trial court's denial of the motions to suppress.
Defendants, Harris and Williams, contend that the trial court erred in denying the motion to suppress the identification of Harris made by Ronald Lewis. Specifically, Harris argues that the photographic lineup containing his photograph was suggestive because there was an ink-mark next to his photograph. Additionally, both defendants contend that testimony from *606 Lewis' treating physicians and therapist was to the effect that Lewis was unable to remember the shooting, thereby making his identifications of Harris when presented with the photographic lineup and at trial unreliable.
The State maintains that Williams does not have standing to contest the identification made relative to Harris. The State also notes that this Court's prior opinions have already reviewed the arguments currently advanced on appeal and specifically rejected the defendants' position in its prior opinions.[2] In any event, the State contends that the trial court's rulings denying the motions to suppress were correct and should not be disturbed.
In State v. Burdgess, 434 So.2d 1062 (La.1983), the defendant challenged the denial of a motion to suppress his confession contending that his confession was given as the direct result of the involuntary confession of a severed co-defendant. The Louisiana Supreme Court held that the defendant had no standing to assert the involuntary nature of his co-defendant's confession. The Court stated:
The failure of the 1974 Louisiana constitution to provide for such standing, while explicitly granting any person adversely affected by a search or seizure conducted in violation of the constitution standing to raise its illegality in the appropriate court, indicates that the framers did not consider that the additional benefit of extending the exclusionary rule to persons adversely affected by others' involuntary confessions would justify further encroachment upon the public interest in having criminal cases decided on the basis of relevant evidence.
State v. Burdgess, 434 So.2d at 1065.
In the instant case, Williams raises the issue of the trial court's denial of the motion to suppress Lewis' identification of Harris. La. Const. art. I, § 5 provides as follows:
Section 5. Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.
Following the same rationale set forth in Burdgess, we hold that the framers did not intend to extend standing in the case of a person adversely affected by an unconstitutional identification procedure. Accordingly, we find that Williams has no standing to challenge the denial of the motion to suppress. However, even if Williams had such standing we fail to find that the trial court erred in denying the motion.
A defendant who seeks to suppress an identification must prove both that the identification itself was suggestive and that there was a likelihood of misidentification as a result of the identification procedure. State v. Prudholm, 446 So.2d *607 729, 738 (La.1984); State v. Payne, 00-1171 (La.App. 5 Cir. 12/13/00), 777 So.2d 555, 558-559, writ denied, 01-118 (La.11/21/01), 802 So.2d 626. Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). Even if the identification could be considered suggestive, it is the likelihood of misidentification which violates due process, not merely the suggestive identification procedure. State v. Thibodeaux, 98-1673 (La.9/8/99), 750 So.2d 916, 932, cert. denied, 99-8224 (La.5/15/00), 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000).
A photographic lineup is considered suggestive if the photographs display the defendant in such a manner that the witness' attention is unduly focused on the defendant. A lineup is also suggestive if there is not a sufficient resemblance of characteristics and features of the persons in the lineup. State v. Biglane, 99-111 (La.App. 5 Cir. 5/19/99), 738 So.2d 630, 634. Even if the identification could be considered suggestive, it is the likelihood of misidentification which violates due process, not merely the suggestive identification procedure. State v. Thibodeaux, 750 So.2d at 932.
In Manson v. Brathwaite, the United States Supreme Court set forth five factors to consider in determining if an identification is reliable: 1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of the prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and, 5) the time between the crime and the confrontation. In evaluating the defendant's argument, the reviewing court may consider all pertinent evidence adduced at the trial, as well as at the hearing on the motion to suppress the identification. State v. Clennon, 98-1370 (La.App. 5 Cir. 6/30/99), 738 So.2d 161, 164. A trial court's determination of the admissibility of an identification should be accorded great weight and will not be disturbed on appeal unless the evidence reveals an abuse of discretion. Id.
In support of their arguments, Harris and Williams cite the medical testimony given by the medical professionals who treated Lewis in connection with the wounds he sustained in the shooting. Dr. Edward Connolly testified that he was the senior neurosurgeon at Ochsner Foundation Hospital and Ochsner Clinic when Lewis was admitted to the emergency room and referred to neurosurgery. According to Dr. Connolly, Lewis suffered an entrance and exit wound to the left posterior parietal area and a spinal cord injury which rendered him a tetraplegic. Dr. Connolly testified that the parietal area on the left side of the brain controls spatial orientation and speech to a certain extent. Dr. Connolly testified that the parietal lobe is not the memory center of the brain but, as a result of Lewis's injury, there was a potential for memory loss. However, Dr. Connolly could not state with a degree of medical certainty that Lewis would be unable to remember the events surrounding the shooting.
Dr. Michael Saucier, a specialist in rehabilitative medicine, testified that he treated Lewis after his surgery for the functional deficits he incurred as a result of his injury. Dr. Saucier testified that Lewis had profound weakness of all of his extremities and some other deficits related to the spinal cord injury, including pain, difficulty with speech, and some memory deficits.
According to Dr. Saucier, at the time of Lewis's discharge in April of 2000, Lewis had short and long-term verbal memory *608 impairment. Dr. Saucier testified that verbal memory has to do with spoken conversation whereas visual memory has to do with the recall of events. Dr. Saucier further testified that he could not definitively conclude that Lewis would be unable to remember the circumstances surrounding the shooting. He also testified that Lewis' memory improved during the time he saw him on an outpatient basis.
Dr. Alvin Rouchell, Chairman of the Psychiatry Department at Ochsner Clinic, testified that he conducted a one-time consultation with Lewis on March 13, 2000. Dr. Rouchell testified that Lewis had memory problems and was becoming depressed as he began to learn about what had happened to him. Dr. Rouchell testified that a patient such as Lewis would improve in his ability to remember things. Dr. Rouchell testified that, based on his one visit with Lewis, he could not definitively say that Lewis did not remember the events of the shooting.
Additionally Collen McAdams, Lewis' speech pathologist, testified that when she first saw Lewis on April 7, 2000, he was having significant memory deficits, as well as language deficits which hindered his ability to find the right words he wanted to use. McAdams testified that, when she had last seen Lewis on April 20, 2000, he had shown some improvement but still had some difficulty recalling recent and remote events. However, McAdams testified that she could not comment on whether Lewis would be unable to remember events surrounding the shooting.
Harris and Williams claim that the above medical testimony reflects that Lewis had no memory of the shooting and if not for the suggestiveness of the identification procedures, Lewis would not have identified Harris. Specifically, Harris argues that the photographic lineup was suggestive because there was an ink-mark next to his photograph. However, Lieutenant English testified at trial that the mark was not on the photograph at the time Lewis observed the lineup and was the result of defense counsel touching the photograph with a pen at the prior trial.
Harris and Williams also contend that Lewis' identification of Harris made in Lewis' hospital room during the first trial was due to suggestiveness, considering defendants were the only two African-American males in the room and considering Lewis' testimony at the first trial where he testified that Lieutenant English had to tell him who to pick out of the lineup. However, an examination of the record reveals Lewis had positively identified Harris on two occasions prior to testifying at the first trial. Additionally, we fail to find that the record supports the defendants' contention that Lieutenant English told Lewis who to select from the photographic lineup. The transcript reveals that, when asked by defense counsel whether Lieutenant English told him who to pick, Lewis stated, "No, he, he, he had, had, had to tell me who to pick, pick, pick out cause the personthe person who did me this, I ain't never going to forget him the rest of my life." Considering the medical testimony concerning Lewis' speech and language deficits, we find a reasonable interpretation of the response that Lewis was attempting to give was that he didn't need to be told who to select. Moreover, Lewis had previously testified at the September 22, 2000 hearing on the motion to suppress that he was never told who to pick out of the lineup.
Furthermore, at the September 22, 2000 motion to suppress hearing and at trial, Lieutenant English testified that, on July 31, 2000, he presented Lewis with two photographic lineups, one of which contained a photograph of Harris and the *609 other which contained a photograph of Williams. When Lieutenant English showed Lewis the photographic lineup containing Harris's photograph, Lewis immediately identified Harris as the person who shot him.
Moreover, throughout his testimony, Lewis maintained that the area was well lit and that he was able to view Harris. When asked whether he had any doubt as to whether Harris was the person who shot him, Lewis stated, "No, no doubt. No doubt. No, no, no, doubt. There's no, no doubt in this whole life time. No, no doubt."
Although there was evidence that defendant suffered impairment to his memory following the shooting, none of the medical professionals who testified could conclude that Lewis would not be able to remember the events surrounding the shooting. Additionally, Lewis was consistent and remained adamant in his identification of Harris. As a result, we fail to find that there was a likelihood of misidentification. Accordingly, the trial court did not abuse its discretion in denying the defendants' motions to suppress.
ASSIGNMENT OF ERROR NUMBER TWO (LARRY HARRIS) AND ASSIGNMENT OF ERROR NUMBER TWO (LEON WILLIAMS, JR.)
The evidence is insufficient to support the verdict.

DISCUSSION
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Ortiz, 96-1609 (La.10.21.97), 701 So.2d 922, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); State v. Williams, 99-223 (La. App. 5 Cir. 6/30/99), 742 So.2d 604, 607. Under Jackson, a review of a criminal conviction record for sufficiency of evidence does not require a court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. A reviewing court is required to consider the whole record and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. State v. Bradley, 03-384 (La.App. 5 Cir. 9/16/03), 858 So.2d 80, 84;[3]State v. Joseph, 01-1211(La. App. 5 Cir. 4/10/02), 817 So.2d 174. In applying this standard, the reviewing court will not assess the credibility of witnesses, nor re-weigh evidence. State v. Rosiere, 488 So.2d 965, 968 (La.1986); State v. Ellwood, 00-1232 (La.App. 5 Cir. 2/28/01), 783 So.2d 423, 427. The trier of fact shall evaluate credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. State v. Rivers, 01-1251 (La.App. 5 Cir. 4/10/02), 817 So.2d 216, 219, writ denied, 02-1156 (La.11/22/02), 829 So.2d 1035. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier of fact, is sufficient support for the requisite factual finding. Id.
Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to *610 reason and common experience. State v. Shapiro, 431 So.2d 372, 378 (La.1982). When circumstantial evidence is used to prove a case, the trial judge must instruct the jury that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." LSA-R.S. 15:438.
In the instant case, defendants, Harris and Williams, were charged and convicted of second degree murder in violation of LSA-R.S. 14:30.1. To convict defendants of second degree murder in this case, the State was required to prove that they had the specific intent to kill or to inflict great bodily harm on the victim. LSA-R.S. 14:30.1(A)(1). Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Specific intent may be inferred from the circumstances of a transaction and from the actions of the accused. State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 82. Additionally, specific intent to kill or inflict great bodily harm may be inferred from the extent of the victim's injuries. State v. Daniels, 01-545 (La.App. 5 Cir. 11/27/01), 803 So.2d 157, 162, writ denied, State ex. rel Daniels v. State, 02-0215 (La.11/27/02), 831 So.2d 272.
In addition to proving the statutory elements of the charged offense at trial, the State is required to prove the identity of the perpetrators. State v. Vasquez, 98-898 (La.App. 5 Cir. 2/10/99), 729 So.2d 65, 69. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. Id. Factors considered in evaluating the reliability of an identification are those factors approved in Manson v. Brathwaite, supra. See, State v. Neoland, 94-943 (La.App. 5 Cir. 3/1/95), 652 So.2d 124, 127, writ denied, 97-1167 (La.10/17/97) 701 So.2d 1332.

Larry Harris
Defendant, Larry Harris, contends that the only element of contention in the instant case was the identity of the perpetrators. Harris argues that the only evidence of identity was the testimony of Mack and Lewis and that this testimony, especially that of Lewis, was unreliable. Additionally, Harris contends Mack's identification was insufficient to justify the conviction considering the dark lighting in the area of the shooting.
The State responds that the evidence was sufficient to convict defendant, noting that both Lewis and Mack positively identified Harris as the shooter and that the lighting was more than sufficient to permit both witnesses to view the perpetrators.
In the instant case, although the State lacked any physical evidence connecting Harris to the crime, two of the victims made positive identifications of Harris as being one of the shooters. In particular, Mack informed Deputy Schoder and Sergeant Buckley of the identity of the two shooters at the scene. After being brought to the emergency room, Mack reiterated her identification of Harris and Williams to Deputy Tucker and provided additional information including Harris' address, date of birth, and a physical description. In addition to Mack's identification, Lewis made a positive identification of Harris after being shown a photographic lineup by Lieutenant English on July 31, 2000 and once again when he testified at the first trial.
Harris, however, contends that both Mack and Lewis' identifications were unreliable considering the dark lighting conditions in the area of the shooting. Harris *611 notes the testimony of defense witness, Ellis Brister, the bartender that was working at the Sports Palace on the night of the shooting. Brister's testimony was that the area where the shooting occurred was dark and although you could see a person, you wouldn't be able to recognize who that person was. However, both Mack and Lewis testified that the area where the shooting occurred was well lit. Additionally, Deputy Schoder testified when he arrived on the scene that there was ample light from the street lights and other light fixtures and that he could see without the assistance of a flashlight. Deputy Schoder also testified that he could see James' body lying next to the car without the assistance of the headlights of his vehicle.
Furthermore, Mack testified that when Harris approached her he asked, "What's happening?" Mack, who had previously dated Harris for approximately two years, was able to recognize Harris' face, as well as his voice. It should also be noted that Mack was the third person to be shot and, therefore, witnessed the first two shootings and was able to testify accordingly.
The testimony in the instant case reveals that the area in which the shooting occurred was sufficiently lighted and both Lewis and Mack were able to make positive identifications of Harris. Accordingly, viewing the evidence in a light most favorable to the prosecution, we find that a jury could have found Harris guilty of second degree murder beyond a reasonable doubt.
Harris's second assignment of error is without merit.

Leon Williams, Jr.
Defendant, Leon Williams, argues that the evidence was insufficient to convict him of the crime, noting that there was no physical evidence linking him to the scene, that Lewis, who was present at the scene, could not identify him, and that Mack's identification was unreliable.
The State responds that there was sufficient lighting to permit Mack to make an identification and that Mack consistently maintained that Harris and Williams were the shooters.
Although there was no physical evidence connecting defendant to the crime scene and Lewis was unable to identify Williams, Mack was able to positively identify him. As noted previously, the record reflects that lighting at the scene of the shooting was sufficient for Mack to make such an identification. Although Mack did not know Williams's full name, she was able to identify him as "Leon" at the scene of the shooting and at the hospital when interviewed by Deputy Tucker. Additionally, Mack testified that she recognized Williams because he worked with Harris. Although she could not remember the exact number of times she had met Williams, she testified that he had picked her up from work on various occasions when Harris was working out of town and that Williams had helped Harris while he worked around her house on at least three occasions. Furthermore, while riding with her sister in New Orleans, Mack observed Williams sitting in a parked truck and as a result contacted police. After the police stopped Williams, Mack was once again able to positively identify Williams as one of the shooters.
Despite Mack's positive identification, Williams contends that he had a credible alibi for the night of the shooting. Williams cites the testimony of his nephew, Wardell Williams, who testified that, on the night of February 21, 2000, his uncle was at home. Wardell testified that on that night, he received a call from Harris and brought the phone to him a little after 11:00 p.m. He later retrieved the phone at around midnight and observed Williams lying in bed. Thereafter, he went to bed *612 but testified he would have heard if his uncle left the house during the night because the dogs would have barked and awakened him.
Williams contends that the State failed to rebut this evidence; however, the State presented the testimony of Deputy Tucker who testified that Williams advised him that he was at a girlfriend's house the night of the shooting. Additionally, Williams argues that firearm examiner Louise Walzer could not say for certain that there was more than one shooter and that, as a result, Mack's testimony was uncorroborated. However, Walzer testified that it was her expert opinion that two guns, a revolver and semi-automatic, were used in the shooting. When Mack was interviewed at the New Orleans Sixth District, Mack again informed Deputy Tucker of the identity of the two gunmen and that Harris was the shooter using the revolver. Furthermore, Lewis' testimony was that, on the night of the shooting, he heard numerous gunshots that sounded as if they were coming from different guns and different directions.
Considering the totality of the testimony, the jury evidently chose to reject Williams' alibi and accepted Mack's testimony. Such credibility choices are addressed to the sound discretion of the trier of fact. See, State v. Rivers, supra. Based on the foregoing, we find that, viewing the evidence in a light most favorable to the prosecution, a jury could have found Harris guilty of second degree murder beyond a reasonable doubt.
This assignment of error lacks merit.

ERROR PATENT DISCUSSION
Both defendants request a review of the record for errors patent. The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). We find no errors which required corrective action.

DECREE
Accordingly, for the reasons assigned herein, the convictions and sentences of defendants, Larry Harris and Leon Williams are affirmed.
AFFIRMED.
NOTES
[1] The records of the first trial, labeled as State v. Harris, case number 01-KA-1299, and State v. Williams, case number 01-KA-1298, were submitted as exhibits in the instant appeal.
[2] In State v. Harris, 01-1299 (La.App. 5 Cir. 10/29/02), 829 So.2d 675 (decision without published opinion) and State v. Williams, 01-1298 (La.App. 5 Cir. 10/29/02), 829 So.2d 675 (decision without published opinion), this Court did address assignments of error setting forth similar arguments but ultimately reversed the convictions of Harris and Williams on separate grounds and remanded the matter for a new trial.
[3] A writ application (No. 03-K-2745) was made to the Louisiana Supreme Court on October 1, 2003. However, as of the date of this opinion, there has been no action by the supreme court.