922 So.2d 1207 (2006)
STATE of Louisiana
v.
Cornell KING.
No. 05-KA-553.
Court of Appeal of Louisiana, Fifth Circuit.
January 31, 2006.
*1208 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Andrea F. Long, Jacqueline F. Maloney, Assistant District Attorneys, Twenty-Fourth Judicial District, Parish of Jefferson, Gretna, Louisiana, for Plaintiff/Appellee.
Margaret S. Sollars, Louisiana Appellate Project, Thibodaux, Louisiana, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., THOMAS F. DALEY, and SUSAN M. CHEHARDY.
THOMAS F. DALEY, Judge.
The defendant, Cornell King, has appealed his conviction of armed robbery. For the reasons that follow, we affirm defendant's conviction.

FACTS:
Janice Leto, a manager for the Burger King located at 2100 Clearview Parkway in Metairie, testified that, on February 7, 2003, at 10:00 p.m., as part of her routine job duties, she checked the Burger King lobby and restrooms, locked the doors, took the lobby cash register, and went into her office. Approximately fifteen to thirty minutes later, someone came up behind her and tugged on her hair. When she turned around, she saw a man between 5'5" and 5'6" with a painted face wearing a *1209 black stocking across part of his face, a cap, a green and off-white checkered flannel jacket, and black gloves.
Leto testified that the man had a gun in his hand and told her to get into the freezer. The man then led Leto and another employee[1] into the freezer, and when he did so, Leto noticed that three other employees (Tina Purvis, Greg Wilson, and "James") were already in there. Leto explained that she had previously given the Burger King keys to Purvis so she could let another employee go out and get something from his vehicle. While they were in the freezer, Purvis returned Leto's keys. Realizing that the doors to the Burger King were locked and that the robber needed the keys to get out, she held them in her hand and waited. The robber subsequently came back to the freezer, got the keys, and left. Approximately fifteen minutes later, Leto and the others left the freezer, and Leto called 911. She testified that the robber took approximately $3,000.00 from Burger King that night.
The testimony of Wilson and Cardinale largely corroborated that of Leto. Additionally, Cardinale testified that Purvis unlocked the door for him between 10:30 and 11:00 p.m. so he could get some rings from his vehicle to show to "James." Cardinale further testified that no one came back inside Burger King with him after he got the rings, and that he was not outside very long.
Wilson testified that the robber was African American, that he weighed approximately 140 to 150 pounds, and that he wore bluish toothpaste on his face. He also testified that, after the robbery, he and "James" were walking north towards I-10 behind the Burger King in the parking lot of an insurance company, when they found a black winter hat similar to the one the robber wore. They subsequently gave the hat to Leto, who in turn, gave it to one of the officers.
Purvis' testimony regarding the robbery itself mostly corroborated that of the other witnesses. Purvis testified that she and defendant were friends, that defendant's nickname was "Teardrop", that defendant used to live with her, and that the last time he was in her apartment was the Tuesday before the Friday night robbery. She explained that, prior to the date of the robbery, defendant was present when she told her father that all of the Burger Kings were getting robbed, and that there were no surveillance cameras.
Purvis testified that she was working at the drive thru on the night of the robbery when someone put something to her back and told her to open the register and move to the back. She claimed she did not see the individual's face or what he was wearing at that time. Afterwards, the individual put her and Wilson into the freezer. Purvis explained that she did not recognize the individual's voice, and that it sounded as if the individual had something stuffed inside his mouth. She noticed the bottom of the individual's sweater when she was in the freezer.
Purvis testified that she called defendant at his girlfriend's house in Florida the Sunday after the robbery. During this conversation, she told him that the Burger King had gotten robbed. Purvis testified that defendant then admitted that he committed the robbery, that he took over $2,000.00, that he initially got Leto's attention by pulling her hair, and that he still had the Burger King keys.
Purvis testified that defendant may have known Burger King's procedures regarding the opening of the safe and the counting *1210 of the money, because he sometimes walked her to and from work, and because one day the week before the robbery, defendant sat in Burger King all day. She testified that she had no indication that defendant was going to commit the robbery, and denied helping him plan it.
Purvis identified State's Exhibit 22 as a Western Union money transfer receipt that she left behind when she moved, which showed that defendant's girlfriend sent $200.00 to Purvis' father, Roy Purvis, on February 9, 2003, two days after the robbery. Purvis explained that defendant owed her the money, but sent it to her father instead of her because she did not have an ID to collect it.
Purvis recognized the sweater/jacket the individual was wearing in State's Exhibit 15, a photograph taken from the surveillance camera at Bud's Broiler located next door to the Burger King, because she had washed one like it at her home. She explained that after seeing that picture, she thought that defendant may have committed the robbery and, that after speaking with him, she was sure of it. Purvis also identified State's Exhibit 21 as a calendar she left behind when she moved. The calendar had the initials "T.D." written all over it, especially in June of 2002. She confirmed that the references indicated that she and defendant talked a lot and that she mailed him letters and called him.
Purvis admitted getting the keys from her supervisor to let someone out that night to get jewelry; however, she testified that she continued doing her work and when that person came back inside she locked the door. Purvis testified that she did not watch the door during the time it was unlocked to see if anybody came in. She recalled giving Leto her keys back in her office before the robbery, not in the freezer as Leto remembered. Purvis explained that, although it was part of her responsibility to check the bathrooms after the doors were locked, she did not do that. She maintained that they usually just watch the last people to make sure they go out the door.
Jefferson Parish Sheriff's Office (JPSO) Detective Larry Dyess testified that a tube of toothpaste was found right outside the entrance door to Burger King. He further testified that the JPSO received a Crimes-toppers' tip that indicated a person by the name of "Teardrop" had committed the crime, and that "Teardrop" was the boyfriend or ex-boyfriend of Tina Purvis, a worker who was there the night of the crime. Detective Dyess and his partner went to the apartment complex to speak to the manager, Diana Lambert, to determine whether Purvis was still living there. She told them that Purvis and defendant had been evicted due to non-payment of rent, but they had left some paperwork and trash on the ground, which they allowed the officers to go through.
Detective Dyess located a Western Union money transfer receipt and a calendar in the trash. At some point, he spoke to Purvis regarding the robbery and the tip, and afterwards, he prepared an arrest warrant for defendant. Defendant was ultimately located in Florida where he was arrested at the residence of his girlfriend, Diane Allen.
Detective Dyess and another detective subsequently went to Florida and brought defendant back to Louisiana. When they returned, Detective Dyess took defendant to the investigations bureau for questioning. After advising defendant of his rights on April 5, 2003, defendant told the detective that he was not going to lie to him and tell him he did not do it because he had spent all day with the detective and liked him, but that giving a statement against himself to the detective was not in his best interest.
*1211 Gregory Harrell, a stipulated expert in the field of forensic DNA analysis, testified that he analyzed a black knit cap and a tube of Crest toothpaste in connection with this case. He testified that his testing on the black knit cap yielded no results. He further testified that the DNA profile that was generated from the tube of toothpaste was consistent with at least three individuals, which meant that at least three people handled that tube of toothpaste. Harrell compared defendant's DNA sample to the sources of DNA on the toothpaste cap, and he concluded that defendant was not excluded from the DNA sample. His report indicated that for the 13 markers tested, the genetic profile of the DNA sample (from the tube of toothpaste) occurred with a frequency of approximately one in 505 persons of the Caucasian, African American, and Hispanic populations.
Stacy Lawson, manager of Bud's Broiler on Clearview Parkway, testified that, on February 7 and 8, 2003, she had surveillance cameras outside of Bud's Broiler located next door to Burger King. She explained that the day after the robbery, she and the police reviewed the videotape from the night before. She identified State's Exhibits 13, 14, and 15 as still photos taken from that videotape of a gentleman passing by the front of their store. Lawson subsequently testified that although the pictures were dated February 8, 2003, after midnight, that time was not correct and she did not know the correct time.
Defendant did not call any witnesses.
After hearing the testimony and considering the evidence, the jury found defendant not guilty on count one (armed robbery of Tina Purvis) and guilty as charged on count two (armed robbery of Janice Leto). He stipulated to being a second felony offender and was sentenced to 49½ years imprisonment. His timely Motion for Appeal was granted.

ASSIGNMENTS OF ERROR
In his second Assignment of Error, defendant argues that the evidence was insufficient to support his conviction.[2] He primarily contends that none of the victims of the robbery, other than Purvis, could identify him, and that Purvis implicated him to shift the blame away from herself. The State responds that it produced sufficient evidence for a rational trier of fact to have found the essential elements of the crime beyond a reasonable doubt, including the issue of identification.
The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the State proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Harris, 03-1297 (La.App. 5 Cir.3/30/04), 871 So.2d 599, 609-610, writ denied, 04-1287 (La.10/29/04), 885 So.2d 583, and writ denied, 04-1289 (La.10/29/04), 885 So.2d 584. In cases involving circumstantial evidence, the trial court must instruct the jury that "`assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.' LSA-R.S. *1212 15:438." Id. at 610. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by defendant offers an exculpatory explanation of the events, but rather the reviewing court must "determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt." State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83 (emphasis as found in the original).
Defendant was convicted of robbing Janice Leto while armed with a dangerous weapon. To support a conviction for armed robbery, the State must prove that there was (1) a taking, (2) of anything of value, (3) from the person of or in the immediate control of another, (4) by use of force or intimidation, (5) while armed with a dangerous weapon. LSA-R.S. 14:64; State v. Collins, 04-1443 (La.App. 5 Cir.7/26/05), 910 So.2d 454, 457-458.
In addition to proving the statutory elements of the charged offense at trial, the State is required to prove the identity of the perpetrator. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Vasquez, 98-898 (La.App. 5 Cir.2/10/99), 729 So.2d 65, 69[3].
After reviewing the transcript and evidence presented, we find that there was ample evidence, both direct and circumstantial, to conclude that defendant was the perpetrator of this offense. Tina Purvis testified that defendant admitted to her on the telephone that he committed the crime, providing her with details of the crime only the perpetrator would have known, such as that defendant pulled Leto's hair to get her attention prior to the robbery. Also, Purvis testified that she received a $200.00 money transfer from defendant two days after the robbery; that she recognized the sweater the perpetrator wore during the robbery because she had washed one like it at her home; and that defendant would have known the closing procedures of the Burger King because he sat in Burger King all day one day the week before the robbery, and he walked her home occasionally after work. Further, Purvis testified that defendant overheard a conversation prior to the robbery where she told her father that Burger King had no surveillance cameras.
Additionally, Detective Dyess testified that he received a Crimestoppers' tip that "Teardrop" had committed the crime and that "Teardrop" was the boyfriend or ex-boyfriend of Purvis, who was there the night of the crime. Purvis confirmed that defendant's nickname was "Teardrop." Detective Dyess further testified that defendant told him he was not going to lie and tell him he did not commit the armed robbery, but that giving a statement against himself was not in his best interest.
Also, Leto and Wilson testified that defendant appeared to be the height of the perpetrator, and Leto testified that defendant's eyes looked like those of the robber's. Harrell testified that defendant could not be excluded from the DNA sample found on the tube of toothpaste located outside Burger King, and that the genetic profile of that sample occurred with a frequency of approximately one in 505 persons of the Caucasian, African American, and Hispanic populations.
*1213 Defendant argues that Purvis lied when she implicated him in order to protect herself. However, as the State pointed out in its brief, the evidence showed that the perpetrator was male and that Purvis was working that evening. Thus, even if Purvis was involved in the crime, that would not have established defendant's innocence.
The jury heard the testimony and clearly found the State's witnesses credible. The question of the credibility of the witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. The credibility of a witness will not be re-weighed on appeal. State v. Johnson, 00-1552 (La.App. 5 Cir.3/28/01), 783 So.2d 520, 527, writ denied, 01-1190 (La.3/22/02), 811 So.2d 921.
Accordingly, we find that a rational trier of fact could have found that the State proved, beyond a reasonable doubt, that defendant was the perpetrator of the armed robbery, and that the State negated any reasonable probability of misidentification in order to carry its burden of proof.
In his first Assignment of Error, defendant argues that the trial court erred when it denied his Motion for a Mistrial necessitated by the unavailability of its only witness, Tina Purvis. The State responds that the trial court did not abuse its discretion in denying the motion.
On the first day of trial, Tina Purvis was called as a witness by the State and then cross-examined by the defense. When her testimony was complete, the trial judge asked whether she was released from her subpoena. The prosecutor said she was excused, but defense counsel stated that he might call her back. The trial judge told Purvis that she was still under subpoena, that she could be attached, and that she needed to return the next day at 10:30 or 11:00 a.m., and he advised her not to discuss her testimony with anybody. Purvis indicated she understood.
When the State rested its case the following day, defense counsel said, "I still may need Tina Purvis, I don't know ." Defense counsel noted that she was supposed to be there at 11:00 a.m. and asked how much time the court was going to give her. The trial judge said she was not in the hallway, and defense counsel responded that he had a right to call her as a witness. The trial judge stated that he did not know how long he was going to wait for her, that he had a right to move on, but that he wanted to give defense counsel a chance to call her if it was something that was imperative. Defense counsel said he needed to clear up a few things. The prosecutor said that Purvis should be there and that she would go outside and call her. She returned stating she did not get an answer.
Defense counsel then moved for a mistrial. The trial judge stated that he wanted defense counsel to put on the record why the witness was needed, and that if it involved divulging strategy, then defense counsel could do it ex parte at the bench. Defense counsel refused. The trial judge then issued a bench warrant for Purvis' attachment, stating:
Alright. I'm going to issue an attachment. I don't think that's going to do any good. You moved for a mistrial, and I'm going to deny it on the grounds that she's already testified, has already been crossed. I haven't heard anything, specifically, what I was looking for in a reason to delay the trial to find  if something came out after she testified that we didn't get to, you know, that we didn't know before when she did testify for the State. If you have any other witnesses, call them.
*1214 After the bench conference, defense counsel called Purvis to the stand. The trial judge informed the jury that Purvis was not present in court as she was instructed to be and that he was not willing to delay the trial to wait for her. Defense counsel then rested his case.
LSA-C.Cr.P. art. 709 provides the law regarding continuances based upon the absence of a witness:
A motion for a continuance based upon the absence of a witness must state:
(1) Facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial;
(2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred; and
(3) Facts showing due diligence used in an effort to procure attendance of the witness.
LSA-C.Cr.P. art. 775 sets forth the grounds for a mistrial:
A mistrial may be ordered, and in a jury case the jury dismissed, when:
. . .
(3) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law;
. . .
(5) It is physically impossible to proceed with the trial in conformity with law;
. . .
A mistrial is a drastic remedy and, except when mandatory, is warranted only when the defendant has suffered substantial prejudice such that he is incapable of receiving a fair trial. State v. Carmouche, 01-0405 (La.5/14/02), 872 So.2d 1020, 1035; State v. Johnson, 03-620 (La. App. 5 Cir.10/28/03), 860 So.2d 180, 186, writ denied, 03-3171 (La.3/19/04), 869 So.2d 849. Whether a mistrial should be granted is within the trial court's sound discretion and denial of a mistrial motion will not be disturbed on appeal absent an abuse of that discretion. State v. Ratcliff, 98-101 (La.App. 5 Cir.2/23/99), 731 So.2d 356, 363, writ denied, 99-1112 (La.9/3/99), 747 So.2d 541.
In State v. Bryant, 33,078 (La.App. 2 Cir.3/1/00), 754 So.2d 387, 390-391, defendant filed a Motion for New Trial on the grounds that the trial court denied a Motion for Mistrial based on the unavailability of a witness. The appellate court stated that no continuance or recess was sought to provide additional time within which to obtain the witness, and that a missing witness was not one of the grounds for a mistrial. It concluded that there was no showing that any ground for mistrial existed and noted that the trial court had found that there was no showing that the witness would ever be found, and thus no recess would have aided the defense.
We find that a mistrial was not warranted in this case. The record reflects that defendant did not move for a continuance or a recess in order to attempt to locate the witness, which suggests that the witness was not actually needed. Also, after the State rested, defense counsel was not even sure he wanted to call Purvis as a witness. The record reflects that he only moved for a mistrial when he saw that Purvis did not appear in court. Further, defense counsel did not provide facts to which the absence witness was expected to testify showing the materiality of her testimony and the necessity for the presence of the witness, even though the trial judge gave defense counsel the opportunity to *1215 present such at the bench outside the presence of the State.
Additionally, as was noted by the trial judge, the witness already testified and defense counsel already had the opportunity to cross-examine the witness the previous day. Finally, the defense was aided by the fact that the trial judge made known to the jury that the witness was supposed to be there and was not, thus casting doubt upon the credibility of the witness' prior testimony. And, as the State noted in its brief, the jury apparently did have doubts regarding her testimony, given the fact that it acquitted defendant on the armed robbery charge naming Purvis as a victim. Thus, we find no merit to defendant's argument that the trial court erred in failing to grant defendant's Motion for Mistrial.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920: State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
We note the trial court failed to properly inform defendant of the prescriptive period for filing post-conviction relief pursuant to LSA-C.Cr.P. art. 930.8. The trial court simply advised defendant that he had "two years to file for post conviction relief." This Court has held that the failure to advise a defendant that the prescriptive period runs from the time his conviction and sentence become final is incomplete. See State v. George, 99-887 (La. App. 5 Cir.1/4/00), 751 So.2d 973, 975. Therefore, this matter is remand to the district court with instructions to inform defendant of the proper provisions of LSA-C.Cr.P. art. 930.8 by sending appropriate written notice to defendant within ten days of the rendition of this opinion, and to file written proof in the record that defendant received the notice. State v. Mills, 04-489 (La.App. 5 Cir.3/29/05), 900 So.2d 953, 966.[4]
As was noted by the State in its brief, the sentence is illegally lenient. The trial judge imposed the enhanced sentence "without the benefit of probation or suspension of sentence." However, LSA-R.S. 14:64 B, the underlying statute, mandates that the sentence be served with benefit of parole, probation, or suspension of sentence. The restrictions on parole eligibility imposed on habitual offender sentences under LSA-R.S. 15:529.1 "are those called for in the reference statute." State v. Esteen, 01-879 (La.App. 5 Cir.5/15/02), 821 So.2d 60, 79, writ denied, XXXX-XXXX (La.12/13/02), 831 So.2d 983 citing State v. Bruins, 407 So.2d 685, 687 (La.1981). Nevertheless, this error need not be corrected on remand because under State v. Williams, 00-1725 (La.11/29/01), 800 So.2d 790, 799, and LSA-R.S. 15:301.1(A), the "without benefits" provision is self-activating. Esteen, 821 So.2d at 78.

CONCLUSION:
For the foregoing reasons, defendant's conviction is affirmed. This matter is remanded for the limited purpose of correctly informing the defendant of the appropriate time period for seeking post-conviction relief.
CONVICTION AFFIRMED; MATTER REMANDED.
NOTES
[1] The other employee was later identified as Steven Cardinale.
[2] When the issues on appeal relate to both sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La. 1992).
[3] Since defendant does not dispute an armed robbery occurred and has only alleged the State failed to prove he was the perpetrator of the crime, the sufficiency of the evidence with respect to the statutory elements of armed robbery is not addressed. See State v. Joseph, 03-1445 (La.App. 5 Cir.5/26/04), 875 So.2d 1011, 1013.
[4] A Writ Application was filed with the Louisiana Supreme Court on June 3, 2005. (2005-KO-1470). As of this date, there has been no disposition.