## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 10-806

STATE OF LOUISIANA

VERSUS

BRIAN KEITH THOMAS

************

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 77,251
HONORABLE J. LARRY VIDRINE, DISTRICT JUDGE

************

## PHYLLIS M. KEATY
## JUDGE

************

Court composed of Marc T. Amy, Shannon J. Gremillion, and Phyllis M. Keaty, Judges.

## CONVICTION AND SENTENCE AFFIRMED WITH INSTRUCTIONS.

Carey J. Ellis, III
Louisiana Appellate Project
Post Office Box 719
Rayville, Louisiana 71269
(318) 728-2043
Counsel for Defendant/Appellant:
        Brian Keith Thomas

Trent Brignac
District Attorney
Julhelene E. Jackson
Assistant District Attorney
Post Office Box 780
Ville Platte, Louisiana 70586
(337) 363-3438
Counsel for:
        State of Louisiana

**KEATY, Judge.**

Defendant, Brian Keith Thomas, appeals his conviction and sentence for attempted second degree murder, alleging insufficiency of the evidence and that his forty-year sentence is excessive. For the following reasons, we affirm Defendant's conviction and sentence with instructions.

## FACTS

The victim, T. C. Charles, was shot on two separate occasions on September 2, 2008, in Ville Platte following Hurricane Gustav. He suffered a flesh wound to his leg early in the day during an argument between he and Kajikianoki Deville. Later that evening, he was shot twice in the face. The charges against Defendant herein concern the second, more serious, shooting.

A call came over the police radio involving shots fired in the area of Peach Street at approximately 10:00 p.m. on September 2, 2008. When Officer Joseph Tate, a patrolman with the Ville Platte Police Department, got to the area, he saw Defendant sitting on the porch of Elmond Gallow's home on the corner of Peach Street and Alton Locks. He then noticed Charles walking in the street; he was covered in blood and in critical condition, having been shot in the face twice.

Charles's tongue had almost been severed as a result of his injuries; however, Officer Tate could understand Charles when he spoke. When Officer Tate asked Charles what happened, Charles stated that he had been shot by "Brian Keith Thomas" and pointed to Defendant. Officer Tate did not see Defendant with a gun.

Former Ville Platte Police Department Officers, Ervin Pitre, II, and Willis Thomas, also responded to the shots-fired call. Charles informed Officer Thomas several times that "Brian Keith" had shot him. Officer Thomas testified that he could

1

hear Charles clearly. Officer Pitre asked Charles what happened, and Charles repeatedly said that "Brian Keith" shot him. Officer Pitre testified that at 5:00 p.m. earlier that same day, he investigated an incident in which Charles was shot in the leg by Deville on Blake Street, about one block away from where Charles was found injured that evening.

Ville Platte Police Officer Rodriquez Soileau also responded to the call. Defendant's car was parked at Gallow's home on the corner of Alton Locks and Peach Street. Charles was leaning over the hood of Officer Tate's car bleeding profusely from his face. When asked who shot him, Charles said "B.K.," which Officer Soileau knew to be Defendant's nickname.

Officer Soileau testified that after Charles left by ambulance, police surrounded the Gallow home and ordered its occupants to step outside. Gallow and two juvenile females exited the home; however, Defendant refused. Officer Soileau entered the home and found Defendant sitting on a couch. It had been raining, and Defendant was very wet. Officer Soileau noticed that the cover to the attic was not securely in place. Another officer went up into the attic and found a gun, but he was told not to touch it and to leave it for the detectives to process later. A BB gun and a bag of various bullets were also found inside the home. Officer Soileau did not see Deville at Gallow's home during his investigation.

Ville Platte Police Officer Nathaniel Savoy also appeared on the scene where he found Charles lying on the ground next to Officer Tate's vehicle surrounded by several officers. The officers told him that Charles said "Brian Keith" had shot him. At that time, Defendant was standing on Gallow's porch, approximately a half block away. Once officers headed toward the house, Defendant went inside. As the police

2

approached the home, Gallow exited and was taken into custody. Police found a BB gun lying on the couch where Defendant was sitting, a .22 rifle in a bedroom, and a handgun in the attic. The cover to the attic was directly above the couch. The handgun found in the attic was wet and covered in wood shavings.

Steven Manterez, a police officer in Missouri and member of the National Guard, testified that he was in Ville Platte on September 2, 2008, as part of hurricane relief efforts. He was riding with Officer Savoy that night. When they arrived at the scene of the shooting, Manterez thought that Charles was dying, so he wanted to get a dying declaration from him. Several officers kept asking Charles who shot him. Although Charles's speech was slurred, Manterez heard Charles say that "Keith Thomas" shot him. Thereafter, Manterez, along with other police officers and guardsmen, approached the home where Defendant was reported to be and set up a perimeter. During a sweep of the home's interior, a pistol was found in the attic.

Charles testified that he and Defendant referred to each other as "brother-in-law" because Defendant had children with Charles's sister. He stated that although he considered Defendant his friend, they sometimes fought because Defendant was "always beating on" his sister.

Charles initially testified about the first gunshot wound that he suffered on September 2, 2008. Defendant and Deville had come to Charles's home and begged him to go with them to Defendant's mother's home. Charles testified that he and Deville got into an argument, and Deville shot him in the leg. Brandon Freeman was present at that time.

Later that day, Charles was at his cousin's home when someone knocked on the door and said Defendant wanted to see him. He met Defendant, and the two started

3

talking on the sidewalk. Defendant asked if Charles would ride with him. Charles agreed and asked Defendant where Deville was. Although Defendant told Charles that Deville was not with him, Deville soon appeared with a gun in his hand and forced him into Defendant's car. Charles testified that Deville and Defendant both had guns when they brought him to Gallow's house.

Defendant parked his car, and the group got out. Charles testified that a bullet then came from nowhere, but it had to have been Deville that shot him because Deville was so close to him. Charles subsequently asked Defendant to help him, but Defendant then shot him in the face. After he was shot the second time, Charles fell down, and Defendant and Deville started dragging him, but ran when they saw the police approaching. Charles then went toward the lights he saw and heard Defendant holler, "he's gone [sic] get away, we've got to finish killing him, he's gone [sic] tell us on [sic] man." Charles was found by police and asked who shot him. He told the police that Defendant shot him and pointed to where Defendant was in the yard. Charles testified that he did not mention Deville because Defendant shot him last, and he saw Defendant shoot him. Charles further testified that although Freeman was charged as a result of the incident, Freeman had nothing to do with the shooting at Gallow's house.[1] Charles testified that he was drinking on the date of the offense, but he had not used any drugs.

Elmond Gallow testified that his home was located at the corner of Peach Street and Alton Locks and that he was home the evening of September 2, 2008. He was playing dominos with his cousin and her friend when Defendant drove up. He subsequently heard two gunshots. He walked outside and saw his friend, Deville,

_____

[1]Freeman testified that he was arrested on charges of attempted second degree murder as a result of the shooting outside Gallow's home, but nothing ever came of those charges.

who did not have a gun. He asked Deville what happened, and Deville said Defendant "just shot that boy." Gallow saw a man lying on the ground "full of blood" near the driver's side of Defendant's car. The man, who had been shot in the face, got up, walked toward the street, and attempted to flag down a truck. As the man was heading toward the street, Defendant "went back at him," and it appeared that Defendant, who had a black handgun, was going to shoot the man again.

Gallow testified that police soon arrived, and he and Defendant walked onto the porch of his home. As police approached, Defendant went inside. Defendant was wet and muddy. Deville did not enter the home. Gallow did not see a gun in Defendant's hand when he entered the home, but he did not know whether Defendant had a gun inside his home because he was outside being arrested. Gallow did not see Defendant put anything in the attic, and he had not recently gone into the attic. Gallow testified that the gun in the attic was not his; however, he did have a .22 rifle, and he had put a silver pistol on top of the refrigerator when his cousin and her friend were at his home.

Gallow explained that he did not initially give as much detail to police as he did in court because he did not want to get involved. For example, in a statement he gave on September 8, 2008, he did not say that Defendant had a gun. Gallow testified that he was a convicted felon, having been convicted of aggravated battery.

Jasmine Rose and Quintina Larnette both testified that they were with Gallow in his kitchen playing dominos and smoking marijuana on September 2, 2008, when they heard two gunshots. Gallow got his silver gun from the top of the refrigerator and went outside to see what happened. When Gallow returned, he told them that

5

Defendant had shot Charles. A few minutes later, Defendant entered the house with a gun in his hand. Neither of them saw Defendant put anything in the attic.

Rose and Larnette admitted giving slightly different versions of the incident when questioned by police on several occasions after the shootings; however, both claimed to have been threatened by Defendant and his girlfriend shortly after the incident.

Deville first testified regarding the shooting incident. He had gone to the store with Defendant and Freeman before going to the home of Defendant's mother. While there, Deville saw Charles in an alley. An argument ensued and Deville grabbed a gun and shot at the ground toward Charles's feet. Charles ran away, and Deville left. He later learned that Charles had been grazed on the leg by a bullet. Deville testified that the black gun he used to shoot toward Charles belonged to Defendant and that he returned the gun to Defendant later that day. Defendant told Deville that he was tired of Charles and was going "to get him."

That evening, Deville saw Defendant and got a ride from him. Charles was in the car with Defendant. Deville testified that he and Charles apologized to each other for the events that had occurred earlier that day. Deville asked Defendant to take him to Gallow's home. After they pulled up to Gallow's home, Charles asked Defendant for "a taste"; Deville testified that he guessed Charles was referring to alcohol. Charles exited Defendant's car and walked toward the driver's side, and Deville walked toward the street. Deville then heard a gunshot and turned around. Defendant told him, "I dome [sic] checked him." When Gallow came outside, Deville told him that Charles had been shot. Defendant then walked up to Charles and shot him again with a high caliber handgun that Deville knew as belonging to Defendant.

6

After Defendant shot Charles, Defendant ran away and Deville checked on Charles. Deville tried to help Charles, but saw Defendant coming back so he ran away. Charles tried to stop a passing truck, but Defendant told the driver not to worry about Charles because he was drunk.

Deville said that he did not enter Gallow's home that night. He turned himself in to the police on September 30, 2008. He testified that he ran because he was scared of Charles's brother. Deville denied being involved in the shooting that occurred outside Gallow's home. Nevertheless, he admitted that there were charges pending against him as a result of the incident.[2]

Travis Allison testified that he had been in jail with Defendant during the year before trial. According to Allison, Defendant "brag[ged] about everything he did." Defendant initially told Allison that Deville shot Charles. However, Defendant later said that he had shot Charles twice and was trying to kill him. Defendant said he tricked Charles into getting in his car. Defendant told him that he and Charles were approached by Barry Vidrine with the Ville Platte City Marshal's Office. At that time, Defendant's gun was in his car. Defendant told Allison that he and Charles then walked to the car, where Deville had been. During the drive to Gallow's house, Deville and Charles supposedly forgave each other. As soon as the group got out of the car, Defendant shot Charles twice. Charles then got up and eventually collapsed in the middle of the street. Allison testified that Defendant said Deville did not have the heart to shoot Charles. Defendant said they went to Gallow's house because that was Deville's hangout spot and Deville had shot Charles earlier in the day; thus, it would look like Deville shot Charles.

---

[2]Deville was charged with several offenses stemming from both encounters with Charles on September 2, 2008, but he had not been tried on those charges at the time of this trial.

7

Allison testified that he was not given anything in exchange for his statement. However, after giving a statement, he asked that his probation be reinstated, and the request was granted. Allison had three prior criminal convictions involving drugs.

Barry Vidrine was a deputy with the Ville Platte Marshal's Office. He testified that while he was investigating an unrelated shooting while off duty on September 2, 2008, he encountered Charles and Defendant sitting in Defendant's car. They both got out and spoke to him and then got in the car and left. Vidrine did not suspect that either Charles or Defendant was armed, and he did not check Defendant's car for weapons. Vidrine did not see Deville at that time.

Francis Charles, T. C. Charles's mother, was questioned about what a social worker reported from a meeting conducted while her son was in the hospital and whether she told the social worker that Charles had been shot in the face by the same person that had shot him earlier that day. Ms. Charles testified that her son was not able to speak well at the time the social worker visited them and that she was not present when Charles was shot. She further testified that Charles was shot by two different men; Deville during the day and Defendant later that night. She admitted, however, that she was not present at either of the shootings.

Dr. Craig Thompson, who was qualified by the trial court as an expert in medicine and general surgery, testified that Charles was treated at the hospital at 5:00 p.m. for a gunshot wound to the leg and released. Charles was admitted again at 11:23 p.m. for two gunshot wounds to the face. Dr. Thompson testified that Charles suffered a gunshot wound to the tongue and the mandible. He stated that Charles's bullet wounds were angular and not likely caused by "straight ahead" gunshots. Charles's injuries would cause him to have some difficulty speaking, and his speech

8

would be impaired. Dr. Thompson testified that Charles could have initially been able to communicate after being shot. Dr. Thompson testified that Charles tested positive for cocaine and benzodiazepines.

The parties entered a stipulation that the crime lab performed ballistic, fingerprint, and DNA testing of the gun found in Gallow's attic and that nothing linked Defendant to the gun.

Shannon Thomas, a Probation and Parole Officer, testified that Defendant had previously entered a guilty plea to illegal use of a weapon and was sentenced to two years at hard labor. Defendant was released from custody on February 20, 2000.

## PROCEDURAL HISTORY

Defendant was arraigned on October 9, 2008, and entered a plea of not guilty to attempted second degree murder and convicted felon possessing a firearm or carrying a concealed weapon. On November 25, 2008, he was charged by bill of information with second degree murder, in violation of La.R.S. 14:30.1; and convicted felon possessing a firearm or carrying a concealed weapon, in violation of La.R.S. 14:95.1. On the same date, an amended bill was filed, amending the charge of second degree murder to attempted second degree murder, in violation of La.R.S. 14:30.1 and 14:27. A second amended bill was filed on February 2, 2009, deleting one of two prior offenses used to support the charge of convicted felon possessing a firearm or carrying a concealed weapon. Defendant entered a plea of not guilty to the amended bill on February 5, 2009. Defendant was rearraigned on April 9, 2009, and entered a plea of not guilty. A third amended bill was filed on November 20, 2009, changing the date of the offenses from August 2, 2008, to September 2, 2008.

9

Jury selection commenced on November 30, 2009. By unanimous verdict, the jury found Defendant guilty as charged on both counts on December 4, 2009. Defendant was sentenced on March 11, 2010, to forty years at hard labor, without benefit of probation or suspension of sentence, for attempted second degree murder. The attempted second-degree murder sentence was to run concurrently with the sentence imposed for convicted felon possessing a firearm or carrying a concealed weapon and consecutively with any sentence received, particularly the sentence in docket number 75061-FB. Defendant was sentenced to twelve years at hard labor for his conviction on the charge of convicted felon possessing a firearm or carrying a concealed weapon and to pay a fine of $2,500. The fine was suspended.

## DISCUSSION

### *Sufficiency of the Evidence*

In his first assignment of error, Defendant contends that there was insufficient evidence for his conviction of attempted second degree murder.

> When considering a claim of insufficient evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). It is not the function of an appellate court to assess credibility or reweigh the evidence. *State v. Stowe,* 93-2020 (La. 4/11/94); 635 So.2d 168, 171.

*State v. Smith*, 94-3116, p. 2 (La. 10/16/95), 661 So.2d 442, 443.

"The essential elements of the crime of attempted second degree murder are a specific intent to kill the victim and the commission of an overt act that tends toward the accomplishment of the victim's death. La.R.S. 14:30.1; *State v. Hollingsworth*, 42,317 (La.App. 2 Cir. 8/15/07), 962 So.2d 1183." *State v. George*, 09-143, pp. 4-5 (La.App. 3 Cir. 10/7/09), 19 So.3d 614, 618.

10

In brief to this court, Defendant contends that although most of the police officers that testified at trial stated that Charles said Defendant shot him, Charles testified that he was first shot in the face by Deville and then by Defendant. Defendant then notes that, other than Deville, Charles was the only witness to testify that Defendant shot him. Defendant also notes that a drug screen indicated that Charles tested positive for cocaine and sedatives. Defendant points to Dr. Thompson's testimony that after the first bullet to the face, a second shot would likely not be straight. Defendant avers that after a gunshot wound to the face at close range, a person could not be sure of who fired the second shot, especially if that person was on drugs, like Charles was proven to be shortly after the second shooting.

Defendant contends that the testimony of Deville and Allison was self-serving. Defendant notes that he did not run, but was sitting on the porch of Gallow's home when police found Charles. Defendant argues that the conflicting testimony cannot be reconciled with the physical evidence. Defendant contends that Deville held a grudge against Charles and had shot him earlier the same day. Although Deville was not found in Gallow's home, both Rose and Larnette placed him inside the house shortly before police arrived. Additionally, Deville fled and was not arrested until approximately one month after the offense. Further, neither Rose nor Larnette saw Defendant put anything in the attic, and they observed him from the time he entered the home until he was arrested. Moreover, both Rose and Larnette testified that Defendant had a gun. However, they said he placed it in the couch, and that is where a BB gun was found.

Defendant notes that none of the police officers testified that Charles said Deville shot him. However, at trial, Charles said Deville shot him and then

11

Defendant shot him. Further, Charles had previously told police that Brandon Freeman shot him. Defendant admits that while the credibility of a witness is not ordinarily reviewed, testimony can occasionally be so inconsistent and incredible as to warrant review and acquittal. Defendant contends the evidence and the testimony is so contradictory and conflicting that his conviction should be vacated.

The State counters that ample evidence was produced to support Defendant's conviction for attempted second degree murder. Charles testified that Defendant shot him. Deville testified that Defendant shot Charles. Additionally, Gallow testified that Deville said Defendant "shot that boy," and Defendant had a handgun. Several police officers testified that when Charles was found, he said that "Brian Keith Thomas," "Brian Keith," "B.K.," and/or "Keith Thomas" shot him. Furthermore, Allison testified that while in jail, Defendant stated that he shot Charles. With regard to Defendant's argument that his not having fled the scene supports his claim of innocence, the State submits that Defendant also failed to offer any assistance to Charles after he had been shot in the face.

The State contends that despite the inconsistencies in their testimonies and/or statements, Gallow, Rose, and Larnette all stated that they saw Defendant with a gun in his hand after Charles was shot in the face. Further, the State submits that despite his having testified that Deville shot him in the face first, Charles never wavered in his testimony that Defendant shot him in the face at least once.

Based on the testimony offered at trial, the jury chose to believe that Defendant shot Charles. It is not this court's function "to assess credibility or reweigh the evidence." *Smith*, 661 So.2d at 443. Accordingly, we find that the State proved beyond a reasonable doubt that Defendant attempted to commit the second degree

12

murder of Charles when he shot him in the face, as "'[d]eliberately pointing and firing a deadly weapon at close range are circumstances which will support a finding of specific intent to kill.' *State v. Brown*, 03-897, p. 22 (La.4/12/05), 907 So.2d 1, 18." *State v. Roberts*, 06-765, p. 5 (La.App. 3 Cir. 1/17/07), 947 So.2d 208, 213, *writ denied*, 07-362 (La. 10/5/07), 964 So.2d 938.

Defendant's first assignment of error lacks merit.

### *Excessiveness of Sentence*

In his second assignment of error, Defendant contends the trial court imposed an excessive sentence of forty years, to run consecutively to any other sentence. He asserts that although the trial court stated it had received a presentence investigation report (PSI), no factors were given that justified the sentence imposed. Instead, the trial court merely stated that Defendant had a long criminal history. Defendant additionally contends the record does not indicate that the trial court took into consideration any aggravating and mitigating circumstances set forth in La.Code Crim.P. art. 894.1. Further, there is nothing in the record to show the trial court particularized the sentence. Thus, Defendant submits that his forty-year sentence, to run consecutively to any other sentence, is excessive.

Although Defendant failed to object to his sentence at the sentencing hearing and failed to file a motion to reconsider sentence, this court has reviewed claims of excessiveness in similar instances. *See State v. Johnlouis*, 09-235 (La.App. 3 Cir. 11/4/09), 22 So.3d 1150, *writ denied*, 10-97 (La. 6/25/10), 38 So.3d 336, *cert. denied*, ___ U.S. ___, 131 S.Ct. 932 (2011); *State v. Thomas*, 08-1358 (La.App. 3 Cir. 5/6/09), 18 So.3d 127. Accordingly, we will review Defendant's claim as a bare claim of excessiveness.

This court discussed the standard of review applicable to claims of excessiveness of sentence in *State v. Bailey*, 07-130, p. 3 (La.App. 3 Cir. 10/3/07), 968 So.2d 247, 250, as follows:

> A sentence which falls within the statutory limits may be excessive under certain circumstances. To constitute an excessive sentence, this Court must find that the penalty is so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no reasonable contribution to acceptable penal goals and[,] therefore, is nothing more than the needless imposition of pain and suffering. The trial judge has broad discretion, and a reviewing court may not set sentences aside absent a manifest abuse of discretion.

*State v. Guzman*, 99-1753, 99-1528, p. 15 (La.5/16/00), 769 So.2d 1158, 1167 (citations omitted).

In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La.5/30/03), 845 So.2d 1061 (citations omitted), this court discussed the factors it would consider in order to determine whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals:

> In deciding whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, an appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case."

Defendant was convicted of attempted second degree murder, which is punishable by ten to fifty years at hard labor, without benefit of probation, parole, or suspension of sentence. La.R.S. 14:27; La.R.S. 14:30.1. Defendant was sentenced to serve forty years at hard labor, without benefit of probation or suspension of sentence.

At the sentencing hearing, the trial court stated that it had gone through the PSI "quite thoroughly," and that Defendant had a long criminal record. The PSI indicates that Defendant is classified as a fourth felony offender, having been convicted of "use or possession of a firearm and bodily injury, and 2 felony convictions for drug crimes." The PSI further indicates that Defendant had pending charges for second degree murder and aggravated/simple escape at the time the PSI was prepared.

In *State v. Stacker*, 02-768 (La.App. 5 Cir. 12/30/02), 836 So.2d 601, *writ denied*, 03-411 (La. 10/10/03), 855 So.2d 327, the defendant was convicted of attempted second degree murder and sentenced to fifty years, without benefit of probation, parole, or suspension of sentence. On appeal, the defendant asserted his sentence was excessive. After reviewing several cases in which the first, third, and fourth circuits had affirmed sentences of fifty years at hard labor for defendants convicted of attempted second degree murder, the fifth circuit affirmed, noting that, in the matter before it:

> [T]he defendant used a firearm to shoot the victim at relatively close range, which, in the present case, resulted in a bullet-hole through the victim's tongue and a bullet lodged in his neck. . . .
>
> While we note that the trial judge in the instant case did not give any reasons for sentencing, we do not find that he abused his wide discretion in determining a sentence. Furthermore, the record supports the imposed sentence of 50 years.

*Id*. at 608.

Based on the cases cited herein and Defendant's classification as a fourth felony offender, we conclude that Defendant's sentence for attempted second degree murder is not excessive.

15

# ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we have found two possible errors patent.

## *Parole Eligibility*

Defendant was sentenced as follows:

> On the Possession of a Firearm by a Convicted Felon, I'm going to sentence you to 12 years at hard labor with the Department of Corrections; I'm going to impose with that a $2,500.00 fine which I will suspend.

> On the Attempted Murder, I'm going to sentence you to 40 years at hard labor with the Department of Corrections. The 12 years on the Possession of a Firearm by a Convicted Felon will run concurrently with this, but I'm going to order that the 40 years, that this sentence run consecutive to any time that you have received, particularly in docket number 75,061-FB.

> I've considered all of the sentencing guidelines and also this sentence will be served without benefit of probation or suspension of sentence.

The court minutes reflect the sentences as imposed, except that the minutes indicate that parole eligibility was denied along with the denial of probation and suspension of sentence. However, "when the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/10), 797 So.2d 62.

Both offenses require imposition of a sentence that is without benefit of *parole*, probation, or suspension of sentence. La.R.S. 14:95.1, 14:27 and 14:30.1. In *State v. Thibodeaux*, 05-680, p. 3 (La.App. 3 Cir. 12/30/05), 918 So.2d 1093, 1094-95, in its error patent review, this court noted, in pertinent part:

> When the trial court is silent as to the required term of parole ineligibility, La.R.S. 15:301.1 obviates the need to correct a sentence. See *State v. Rivers*, 01-1251 (La.App. 5 Cir. 4/10/02), 817 So.2d 216, *writ denied*, 02-1156 (La.11/22/02), 829 So.2d 1035.

16

In *State v. King,* 05-553 (La.App. 5 Cir. 1/31/06), 922 So.2d 1207, *writ denied*, 06-1084 (La. 11/9/06), 941 So.2d 36, the defendant was found guilty of one count of armed robbery; he stipulated to being a second felony offender and was sentenced to forty-nine and one-half years imprisonment. On appeal, the court found the sentence imposed was illegally lenient because the trial court imposed the enhanced sentence "'without the benefit of probation or suspension of sentence.'" *Id.* at 1215. The court explained, in pertinent part:

> However, LSA-R.S. 14:64 B, the underlying statute, mandates that the sentence be served with benefit of parole, probation, or suspension of sentence. The restrictions on parole eligibility imposed on habitual offender sentences under LSA-R.S. 15:529.1 "are those called for in the reference statute." *State v. Esteen*, 01-879 (La.App. 5 Cir.5/15/02), 821 So.2d 60, 79, *writ denied*, 2002-1540 (La.12/13/02), 831 So.2d 983 citing *State v. Bruins*, 407 So.2d 685, 687 (La.1981). Nevertheless, this error need not be corrected on remand because under *State v. Williams*, 00-1725 (La.11/29/01), 800 So.2d 790, 799, and LSA-R.S. 15:301.1(A), the "without benefits" provision is self-activating. *Esteen*, 821 So.2d at 78.

*Id*. at 1215.

In *State v. Wilturner*, 03-719 (La.App. 3 Cir. 11/5/03), 858 So.2d 743, the trial court failed to impose the defendant's sentence for the conviction of sexual battery without the benefits of parole, probation, or suspension of sentence which was required under La.R.S. 14:43.1(C). This court found that pursuant to *Williams*, 800 So.2d 790, the trial court's failure to specify that the sentence was subject to the statutory restrictions did not require remand for correction; instead, the sentence was deemed to include those restrictions by operation of law. *See also State v. Darbonne,* 01-39 (La.App. 3 Cir. 6/6/01), 787 So.2d 576, *writ denied*, 02-533 (La. 1/31/03), 836 So.2d 64; *State v. Colar*, 04-1003 (La.App. 3 Cir. 2/2/05), 893 So.2d 152.

In the instant case, we read the sentencing transcript to provide that the restriction on probation and suspension of sentence applied only to the second

17

sentence imposed, the forty-year sentence for attempted second degree murder. Because the trial court was completely silent regarding the benefit restrictions on the twelve-year sentence for possession of a firearm by a convicted felon, that sentence is deemed to contain the required benefits restriction by operation of law. *See* La.R.S. 15:301.1. Further, as to trial court's silence regarding parole eligibility with regard to Defendant's attempted second degree murder sentence, that part of the "without benefits" provision is also self-activating. *Id.*

*Post-conviction relief notice*

Louisiana Code of Criminal Procedure Article 930.8 provides the defendant has two years after the conviction and sentence become final to seek post-conviction relief. The minutes of sentencing reflect that the trial court "advised the defendant of his two-year prescriptive period for filing post conviction relief which begins to run today or from time of finality of Judgment." The sentencing transcript indicates the trial court stated, "there is a two year prescriptive period for you to apply for post conviction relief." As stated previously, a conflict in the minutes and transcript is resolved in favor of the transcript. *See Wommack*, 770 So.2d 365. We conclude that the information provided by the trial court was insufficient.

Accordingly, the trial court is directed to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to him within ten days of the rendition of this opinion and to file written proof in the record that Defendant received the notice. *See State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

**DECREE**

Defendant's conviction and sentence for attempted second degree murder are affirmed. The trial court is directed to inform Defendant of the provisions of La.Code

18

Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof in the record that Defendant received the notice.

**CONVICTION AND SENTENCE AFFIRMED WITH INSTRUCTIONS.**